**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0551n.06
Filed: August 8, 2007

No. 05-4659

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**


DAVID BENJAMIN,

     *Plaintiff-Appellant*,

v.

MERON BRACHMAN, PETER FREZNER,
KAREN HOLBROOK, JOHN G. KRAMER,
HAGOP S. MEKHJIAN, RICHARD R. MURPHEY, JR.,
TIMOTHY O'DELL, MICHAEL PARA, NANCY PETRO,
ROBERT E.H. RABOLD, FRED SANFILIPPO,
GRAYCE M. SILLS, SARAH ROSS SOTER, R. REED FRALEY,
DANIEL M. SLANE, ZUHEIR SOFIA, ANN I. WOLFE,

(MEMBERS OF THE BOARD OF TRUSTEES OF
THE OHIO STATE UNIVERSITY HOSPITALS)

AND

DAVID E. SCHULLER, CLARA D. BLOOMFIELD,
WILLIAM B. FARRAR, REINHARD A. GAHBAUER,
ELLEN HARDYMON, CURTIS J. MOODY,
GRETA J. RUSSELL, ROBERT B. SMITH,
RICHARD J. SOLOVE, MANUEL TZAGOURNIS,

(MEMBERS OF THE BOARD OF TRUSTEES OF THE
ARTHUR G. JAMES CANCER HOSPITAL AND
RICHARD J. SOLOVE RESEARCH INSTITUTE[*])

     *Defendants-Appellees*.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

**OPINION**

---

[*] R. Reed Fraley, Daniel M. Slane, and Zuheir Sofia sit on both boards.

1

**BEFORE: ROGERS and GRIFFIN, Circuit Judges; and COHN,** [**] **District Judge**

**AVERN COHN**, **District Judge**:  Plaintiff, David Benjamin, M.D. appeals the district

court's dismissal of his national origin and "class of one" discrimination claims under the Equal

Protection Clause, as well as his substantive and procedural due process claims on summary

judgment.  Plaintiff's claims rise from the revocation of his medical privileges from (A) The

Ohio State University Medical Center (Medical Center) and at (B) the Arthur G. James Cancer

Hospital and Richard J. Solove Research Institute (James Institute) following a lengthy peer

review.  The defendants are members of the Board of Trustees of The Ohio State University

Hospitals and the Board of Trustees of the James Institute.  They are primarily responsible for the

administration of The Ohio State University's health care system.[1]

For the following reasons we affirm the district court's dismissal on summary judgment

of Plaintiff's substantive and procedural due process claims.  We also affirm the dismissal on

summary judgment of Plaintiff's national origin and class of one discrimination claims, although

for different reasons than those stated by the district court.

## I.  BACKGROUND

### A.  Plaintiff's Background

Plaintiff is a graduate of the Hadassah School of Medicine at Hebrew University,

Jerusalem, Israel.  He spent eight months in residency at the University of California-Los

---

[**]  The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]  The parties generally do not differentiate between the groups of defendants.  Thus, where the record is clear, we have referenced the individual or institution.  Otherwise, we refer to "the defendants" generally.

Angeles; completed a three-year research fellowship at the National Institutes of Health (NIH); and completed a two-year clinical fellowship at Georgetown University. While working at the University of Oklahoma, he received an NIH grant to study HIV-1 and B-Cell lymphokines.

In July of 1990, Plaintiff was hired by The Ohio State University College of Medicine (College of Medicine) as a researcher and faculty member. Plaintiff brought with him his NIH grant. It is undisputed that Plaintiff was expected to devote the majority of his time, approximately 80%, to research activities and had limited teaching and clinical responsibilities caring for patients. Plaintiff was granted tenure two years after his appointment.

Plaintiff was granted full medical privileges to treat patients at the James Institute and at the Medical Center. He was assigned to the Division of Hematology/Oncology, which is part of the Department of Internal Medicine. Plaintiff was compensated for his patient practice through a separate contract with DMF of Ohio, Inc. (DMF), a private practice group in the Department of Internal Medicine.

The James Institute is governed according to bylaws (the James Bylaws). The James Bylaws provide that medical privileges are granted for a two-year period. Initial applications and all subsequent applications for renewal of medical privileges are reviewed by the Credentials Committee. An applicant must document that he meets the qualifications for membership and also be recommended by his division chief and academic department chair. Plaintiff's medical privileges were renewed in 1993.

In 1995, the Department of Internal Medicine adopted the requirement that all members of the medical staff be board certified in a medical specialty approved by the American Medical Association and the American Board of Medical Specialists. Plaintiff was the only member of

3

the Division of Hematology/Oncology with medical privileges who was not board certified. However, Plaintiff was granted a waiver and applied to take his exams for board certification in 1996, which Plaintiff subsequently failed.

## B. Plaintiff's Disputes With His Colleagues

Plaintiff's medical privileges at the Medical Center were revoked in 2001, and his privileges at the James Institute were revoked in 2002. Plaintiff says that the revocations were partly the result of strained relationships he had with his supervisors and colleagues stemming from several disputes. One dispute regarded the division of overhead expenses among the doctors in Plaintiff's practice group. Plaintiff was required to share overhead expenses equally with the rest of the physicians in the DMF practice group. Plaintiff complained that this arrangement was not fair to physicians who focused primarily on research and did not earn as much as physicians who concentrated on patient practice. Plaintiff says that around May of 1995, he complained to Dr. Ernest Mazzaferri, Chairman of the Department of Internal Medicine and president of DMF, and to Dr. James Ungerleider, Director of the Division of Hematology/ Oncology, that the division of the overhead expenses was unfair. Plaintiff says that Mazzaferri and Ungerleider disagreed with him, which caused tension among them.

Next, Plaintiff says that he and Ungerleider had a strained relationship after Plaintiff complained about Ungerleider serving as Division Director and about his conducting Plaintiff's faculty review, as Ungerleider was not a tenured professor. Ungerleider stopped performing Plaintiff's review after he complained.

Plaintiff also says that around the same time he had a dispute with the former Division Director, Dr. Stanley Balcerzak, after Balcerzak allegedly removed $7,000.00 of Plaintiff's

4

research funds without authorization. Plaintiff says he also complained to members of the Division of Hematology/Oncology that Balcerzak was having a relationship with a female employee.

Finally, Plaintiff says that in 1994 his request for research funding was only partially approved by the Division of Hematology/Oncology. Plaintiff eventually received the full amount of his request after he complained to the Dean of the College of Medicine.

### C. National Origin

Plaintiff is an Iraqi-born Israeli and a naturalized citizen of the United States. Plaintiff says that his national origin also motivated the inquiry into his patient care, and led to the application of a higher standard of care in his peer review than was used to evaluate other physicians. Plaintiff says that in an effort to coerce him to leave The Ohio State University, he was harassed on account of his national origin on several occasions as summarized below:

- In 1990, Barbara Nesbittt, Ungerleider's administrative secretary, called attention to Plaintiff's Israeli accent and stated, "This is not the Middle East and we Americans are different."

- On December 10, 1997, Dr. Clara Bloomfield, who became the Director of the Division of Hematology/Oncology in 1997, told Plaintiff that she "needed to be blunt" with him because he was "not American and [he did] not understand the American way." Bloomfield also said that she was married to a "bloody foreigner" like Plaintiff.

- Dr. Richard Gams, a physician who sat on one of Plaintiff's peer review committees, and various other colleagues told Plaintiff that the university had "tried to get rid" of him because he was an Israeli, but that he did not "get the message."

- His colleagues ignored his wife at annual office parties because he was not born in America.

- Nurses told him that patients from rural Ohio could not understand him because of

5

his accent.

- Ungerleider repeatedly asked him about his service in the Israeli Army, and they had many discussions about his military experience between 1990 and 1995.

### D. Medical Privileges

The following is the history of Plaintiff's peer review:

### 1. 1996

In August of 1996, a patient under Plaintiff's care identified as "VM" died. Plaintiff had diagnosed VM with primary lymphoma of the bones or systemic lupus and was administering Cytoxan (a chemotherapy agent) and Prednisone (a common steroid) to treat her. A resident reported the death and questioned the cause of it. Mazzaferri reviewed VM's chart and concluded that VM had probably died as a result Plaintiff's treatment.[2] Mazzaferri then asked Dr. Earl Metz, a senior physician in the Division of Hematology/Oncology, to review VM's case. Metz expressed concerns about the quality of Plaintiff's patient care.[3]

### 2. 1997

Mazzaferri then requested that Dr. William Bay, Chairman of the Clinical Quality Management Committee (CQM Committee) conduct a peer review of Plaintiff's patient care between December 11, 1996, and February 21, 1997.[4] Bay reviewed Plaintiff's care of VM and two other patients, and addressed a report to the Credentials Committee, in which he concluded

---

[2] Mazzaferri did not document his review.

[3] Metz did not document his review.

[4] Prior to the death of VM, Plaintiff had been subject to one prior peer review by the CQM Committee. The review concerned Plaintiff's care of two patients. After completing an evaluation to which Plaintiff responded, the CQM Committee concluded that no further action was required.

6

that VM probably died because of Plaintiff's prescribed treatment. Bay also reported that he reviewed the outpatient charts of twelve other patients treated by Plaintiff and commented that:

> Unifying diagnosis were not made, patients were followed with numerous laboratory tests but often no progressive pattern of care was given ... My conclusion after review of these twelve charts is that I cannot say there was negligent care however I do feel Dr. Benjamin's approach to care, as documented in these charts, is inconsistent with the abilities of a board certified hematologist and oncologist providing care at a University Medical Center.

(J.A. 1352–53.) Noting that Plaintiff was not board certified, Bay recommended that no further credentialing occur until the Division of Hematology/Oncology provided the Credentials Committee with a plan to correct Plaintiff's deficiencies.

Bay then assembled a three-person panel to review Plaintiff's patient care. The panel consisted of the following hematologists/oncologists from Plaintiff's Division: Drs. Eric Kraut, Brent Behrens, and Richard Gams.[5] The panel reviewed twenty-five patient charts. They concluded that Plaintiff's patient care "[did] not meet the standards expected of an academic hematologist oncologist." (J.A. 1360.) In particular, they noted that Plaintiff did not appreciate "the pathophysiologic mechanisms of hematologic disease nor [have] an understanding of the efficient evaluation of oncologic disorders." *(Id.)*

Bay also requested that Dr. Herbert Flessa, professor emeritus of medicine at the University of Cincinnati Medical Center, review VM's case. Flessa also attributed VM's death to Plaintiff's treatment and said that it "was not acceptable judgment for a Hematologist/ Oncologist in a tertiary center." (J.A. 1482–83.)

---

[5] Plaintiff says that the panel was selected with significant input from Mazzaferri, and that one of the reviewers on the panel was Balcerzak, with whom he had disputes. *See supra,* section I.B. The record reflects that Bay selected the panel, and while he requested that Balcerzak sit on the panel, Balcerzak declined.

On June 5, 1997, Bay wrote to Plaintiff that the CQM Committee had reviewed his patient care, and that their findings had raised questions about the quality of his patient care, which would be discussed at a committee meeting on June 11, 2007. Plaintiff was invited to attend the meeting and provide comments. Plaintiff attended the meeting and denied that there were any deficiencies in his clinical competency. He instead asserted that there was a conspiracy against him.

The CQM Committee recommended that the Division of Hematology/Oncology, in conjunction with the Department of Internal Medicine, conduct a retrospective chart review of Plaintiff's patient care to determine if it was acceptable in a tertiary medical center. Ungerleider believed that a complete chart review was not practical and instead wrote to the three-member panel requesting that they submit a more complete report regarding the twenty- five cases that they had reviewed. The panel complied and presented their review and conclusions at a departmental CQM Committee meeting on August 6, 1997. The CQM Committee members also heard the reviews of Bay and Flessa. Subsequently, they concluded that "Dr. Benjamin does not meet the Standards of Care of a board certified Hematologist/Oncologist at a tertiary care center." (J.A. 1424.) They recommended that the Chairs of the Department of Oncology/Hemtology and Internal Medicine establish a plan to supervise Plaintiff's patient care. Mazzaferri rejected this recommendation on grounds that the Department of Internal Medicine did not have the resources to provide adequate monitoring, and because he did not believe that Plaintiff's peers should be responsible for monitoring him. The CQM Committee met again to discuss Plaintiff's case, but was unable to come up with an alternative plan for correction.

On September 15, 2007, Dr. David Schuller, the Executive Director of the James

Institute, called a special meeting of the James Medical Staff Administrative Committee (the MSAC) to address what to do about Plaintiff. The MSAC unanimously approved the initiation of corrective action as provided for in the James Bylaws. In accordance with the James Bylaws, Schuller requested that Mazzaferri appoint a Departmental Investigative Committee to review the prior evaluations. The three-person Investigative Committee reviewed the CQM committee's evaluation and reported that they were in unanimous agreement that: (1) VM's death raised questions about the Plaintiff's quality of patient care; (2) the findings of the previous reviewers were "serious, consistent and justified" and not tainted by malice; and (3) Plaintiff's patient care does not meet the standard of care of an academic hematologist/oncologist. (J.A.1646–47.) The Investigative Committee recommended that Plaintiff not be assigned further patient care. The report was addressed to Bloomfield, who had succeeded Ungerleider as the Division Director.

Bloomfield then met with Plaintiff to discuss the findings of the Investigative Committee. Plaintiff says that at this meeting Bloomfield remarked that she was married to a "bloody foreigner" like him, and said that she needed to be blunt with him because he was not an American and did not understand "the American way." Plaintiff says that instead of discussing the findings of the Investigative Committee, Bloomfield told him that if he did not resign within six months, she would pursue an outside review of his patient care to ensure that he would be unable to practice medicine again.

Bloomfield denies that she called Plaintiff a "bloody foreigner" or said that he did not understand "the American way." However in a letter to Schuller, she admits that she talked to Plaintiff about informally resolving his status and did indicate to Plaintiff that she would consider obtaining an external review of his practice.

### 3. 1998-1999

Bloomfield requested that Dr. Raymond Weiss, an external medical auditor, review ten patient files that had been the subject of criticism by the CQM Committee. Like the previous reviewers, Weiss concluded that Plaintiff's care of VM was "substandard for a Hematologist/ Oncologist at a major academic center." (J.A. 1762). Wiess's evaluation likewise echoed the problems cited by previous reviewers – including mismanagement of cases and excessive laboratory testing.

Bloomfield then recommended to Schuller that Plaintiff's medical privileges be immediately and summarily suspended.[6] Schuller however did not immediately take any action against Plaintiff. He instead impaneled the James Institute Grievance Committee (the Grievance Committee), a four-member committee to evaluate Plaintiff's patient care. Plaintiff was allowed to participate in choosing the committee members. Two members, Dr. Herbert Newton and Dr. Sheila Hodgson, had written letters in support of Plaintiff to Bloomfield. Three of the four panel members issued a report concluding that Plaintiff's practice "does not conform to the standards of a university practitioner." (J.A. 1523.) Hodgson did not sign the report, nor did she state her comments regarding her review. The Grievance Committee did not recommend a course of action. Schuller accepted the report but ordered additional independent reviews of Plaintiff's patient care before taking any action.

---

[6] Around this same time, DMF decided not to renew Plaintiff's employment contract with the practice group. Plaintiff says that Mazzaferri ordered the non-renewal. Plaintiff continued to treat patients on his own.

10

### 4. 2000

Schuller asked Dr. Michael Gerver, the new Chairman of Internal Medicine to conduct a review. Grever expressed concern that Plaintiff had difficulty synthesizing clinical information. He also agreed with Mazzaferri that it was not practical or appropriate for the Department of Internal Medicine to monitor Plaintiff's patient care.

Schuller also requested that Dr. Paula Silverman, the clinical program director in the Division of Hematology/Oncology at University Hospitals in Cleveland, Ohio, conduct a review. She reviewed forty-seven of Plaintiff's patient charts and found that he had provided inadequate care in twenty-three of the cases.

### 5. 2001

In January of 2001, Schuller advised Plaintiff that based on the reviews conducted to date, he was recommending to the MSAC that Plaintiff's medical privileges be revoked. Schuller informed Plaintiff that he had the right to appeal the recommendation to the MSAC.

Plaintiff appealed Schuller's recommendation and the MSAC held three days of hearings, in which several doctors who had evaluated Plaintiff's patient care gave testimony. Plaintiff attended one day of the hearings, during which he cross-examined a witness, answered questions, and presented his case for approximately three hours.

After the hearings, the MSAC stated in a letter to Schuller that they believed that their duty was to determine whether Plaintiff was "practicing below the level of care expected at an academic medical center specializing in cancer therapy and research." (J.A. 1704.) A majority (two-thirds of the members) of the MSAC found that Plaintiff was not practicing at this standard of care, and recommended that his medical privileges be revoked. They noted however, that this

11

standard of care was higher than the standard used to evaluate negligence in medical-legal cases. (*Id.*)

In accordance with the MSAC's recommendation, Schuller revoked Plaintiff's medical privileges at the Medical Center on July 1, 2001.

### 6. 2002

In accordance with the MSAC's recommendation, Schuller revoked Plaintiff's medical privileges at the James Institute on April 5, 2002.

As provided for in the James Bylaws, Plaintiff appealed the revocation of his medical privileges from both the James Institute and the Medical Center to The Ohio State University Board of Trustees. His appeal was denied. Plaintiff then appealed the revocations of his medical privileges to the President of The Ohio State University, who also denied Plaintiff's appeal.

The James Institute filed a report with the National Practitioner Data Bank (the NPDB) regarding the revocation of plaintiff's medical privileges. The NPDB is a federally mandated databank for maintaining information regarding physicians practicing at medical facilities throughout the United States. Under federal law, the James Institute was required to report to the NPDB the revocation of a physician's medical privileges. The James Institute reported that the basis for the revocation was that Plaintiff was "practicing below the level of care expected at an academic medical center specializing in cancer therapy and research." (J.A. 1718.) In response to the question, "Is the Adverse Action Specified in This Report Based on the Subject's Professional Competence or Conduct?", the James Institute responded, "Incompetence." (*Id.*)

Schuller also reported the revocation to the State Medical Board, which determined

12

that further action was not required.  Plaintiff's medical license continues to be active in Ohio.

Plaintiff also continues as a tenured professor in the College of Medicine, but has no teaching or

research responsibilities.

### 7.  Procedural History

On July 5, 2002, Plaintiff filed his complaint with the district court seeking reinstatement

at the James Institute and the Medical Center, restoration of his medical privileges, and the

removal of adverse comments in his NPDB report.[7]  On December 1, 2005, the district court

granted the defendants' motion for summary judgment, after finding that Plaintiff had failed to

establish the existence of any genuine issues of fact regarding his claims.

Plaintiff filed a timely appeal under Fed. R. App. P. 4(a).   We have jurisdiction to review

the district court's decision under 28 U.S.C. § 1291.

### II. STANDARD OF REVIEW

Review of a motion for summary judgment is de novo.  *Lautermilch v. Findlay City*

*Sch.*, 314 F.3d 271, 274 (6th Cir. 2003).  Summary judgment will be granted when the moving

party demonstrates that there is "no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine

issue of material fact when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's

---

[7] Plaintiff also filed a suit in state court over revocation of his medical privileges.  The procedural history of this suit is detailed in the district court's opinion and order.

response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *see also Anderson*, 477 U.S. at 249–50 (summary judgment is appropriate when the evidence is "merely colorable" or "not significantly probative"). Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. *Bsharah v. Eltra Corp.*, 394 F.2d 502, 503 (6th Cir. 1968).

The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 251–52). The court "must view the evidence in the light most favorable to the non-moving party." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 101–02 (6th Cir. 1995).

### III. ANALYSIS

### A. PROCEDURAL DUE PROCESS

#### 1. Introduction

Plaintiff claims that his procedural due process rights were violated during his peer review because (1) he was not given sufficient notice of the charges against him; (2) he was not given a meaningful opportunity to refute the charges against him; and (3) his reviewers were

14

biased against him. Plaintiff further asserts that the district court erred in narrowing the scope of its inquiry to whether he had received procedural due process with regard to only the MSAC hearings.[8]

## 2. The Legal Standard

The Due Process clause of the Fourteenth Amendment provides that "no State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. When considering a due process claim, courts undertake a two-step analysis. The first step is to determine whether the plaintiff has a liberty or property interest entitled to due process protection. *Bd. of Curators v. Horowitz*, 435 U.S. 78, 82 (1978). Here, the defendants do not dispute that Plaintiff has a property interest in maintaining his medical privileges, and the issue is not before us.

Where a plaintiff is entitled to due process, a court must then determine whether the plaintiff was provided with sufficient notice and the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted) (quoting *Armstong v. Manzo*, 380 U.S. 545, 552 (1965)). In *Mathew*s, the Supreme Court set forth three factors that a court must weigh in its procedural due process analysis:

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and

---

[8] Plaintiff also argues that the district court erroneously relied on the analysis in *Yashon v. Hunt*, 825 F.2d 1016 (6th Cir. 1987) for guidance on the proper role of a court in evaluating a hospital's decision to grant or deny a physician medical privileges. Since on de novo review we evaluate the merits of Plaintiff's claim independent of the district court's decision, we need not address this argument.

the probable value, if any, of additional or substitute procedural safeguards and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 335.

### 3. Whether the District Court Erroneously Determined That the Due Process Inquiry Should Be Limited to the MSAC Hearings

#### a. Argument

Plaintiff argues that the district court erroneously narrowed the scope of its due process inquiry to the MSAC hearings, because in doing so, it ignored his arguments that (1) the MSAC merely confirmed the adverse evaluations by prior evaluators and did not conduct a de novo review as required by the James Bylaws, and (2) his rights to procedural due process were violated due to the culmination of violations of the James Bylaws occurring throughout his peer review.

#### b. Resolution

We agree with the district court that Plaintiff's arguments that he did not receive procedural due process in the committee reviews and meetings leading up to the MSAC hearings need not be evaluated. The Constitution does not require notice of an investigation that might ultimately lead to the deprivation of a property interest. *See Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 524–25 (10th Cir. 1998) (the fact that an administrator and several professors denied the existence of written complaints in a hearing regarding a university's charges that a law professor had improper sexual relations with student did not violate professor's procedural due process rights where professor received summaries of statements and was able to cross-examine complainants). What the Constitution requires is notice of the charges and a meaningful

16

opportunity to be heard regarding the actual deprivation of a constitutionally protected interest. *Id.* The facts here show that it was the decision of the MSAC, and not the prior review committees, that ultimately led to Schuller's revocation of Plaintiff's medical privileges. While Schuller's recommendation that Plaintiff's medical privileges should be revoked was based on the reviews occurring prior to the MSAC hearing, Plaintiff had a right to appeal the recommendation to the MSAC, and Schuller could not act without the approval of the majority of the MSAC members.

Likewise, because it was the MSAC's decision that led to the revocation of Plaintiff's medical privileges, it is immaterial whether the James Bylaws were violated prior to the MSAC hearing. We also note that where notice and a meaningful opportunity to be heard are provided, "[t]he violation of a state's formal procedure . . . does not in and of itself implicate constitutional due process concerns." *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996).

Next, the fact that the MSAC did not conduct a de novo review does not lead to the conclusion that Plaintiff was denied procedural due process. The James Bylaws specifically state that while the MSAC hearings are "de novo," "evidence of the prior recommendations of the director and the committees may be presented." Bylaw 3335-111-06(D)(1). Moreover, the committee members heard the live testimony of many of the evaluators, and did not simply accept the conclusions of the prior evaluators. For instance, MSAC Chairman Larry Copeland noted that the MSAC was "concerned regarding the lack of substance to most of the issues raised by Dr. Silverman. In general, her testimony carried little or no weight in the decision process." (J.A. 1711.) Moreover, the MSAC did not unanimously agree that Plaintiff's medical privileges should be revoked. One-third of the members voted against revocation. Considering these

17

circumstances, the MSAC was clearly not spoon-fed a result.

**4. Whether Plaintiff Received Sufficient Notice of the Charges Against Him**

**a. Argument**

Plaintiff also argues that he did not receive sufficient notice of the charges against him because he was not told that he would be evaluated under an academic or tertiary standard of care, which is higher than the standard of care for negligence in medical malpractice cases, and because he was never provided with a formal written definition of the standard of care. Consequently, Plaintiff says that he was unable to adequately refute the evidence against him.

**b. Resolution**

Plaintiff received adequate notice of the charges against him despite the fact that Schuller did not provide him with a formal written definition for the standard of care at the James Institute. In *Yashon v. Hunt*, 825 F.2d 1016, 1025 (6th Cir. 1987)*,* we held that notice "need only be specific enough to enable the individual to respond to the charges raised against him and need not rise to the level of specificity required of a criminal indictment." Here, Schuller sent Plaintiff a letter on January 30, 2001, informing him of the dates on which the hearings would be held. This letter included a description of the charges against him, the history of the charges, and the findings of the various committees. Schuller also sent Plaintiff a second letter summarizing the specific concerns to be addressed at the MSAC hearing. This letter included which documents the MSAC might consider and a list of potential witnesses.

Next, regarding the standard of care, the James Bylaws clearly state that the "purpose of the medical staff of the [James Institute] shall be: (A) To ensure that all patient admitted to the [James Institute] shall receive the best possible care and treatment in a teaching environment".

18

Bylaw 3335-111-02(A). There is no question that Plaintiff knew that he was practicing at an academic facility.

### 5. Whether Plaintiff Was Given a Meaningful Opportunity to Be Heard

#### a. Argument

Plaintiff argues that he was not given a meaningful opportunity to be heard because at the time of his hearings he had not fully recovered from shoulder surgery occurring on March 9, 2001, and did not have adequate time to prepare his defense. Plaintiff requested a postponement of the hearings, which was denied. Plaintiff also complains that he was given only one afternoon to present his case and was not permitted to discuss all of the patients who had been evaluated during the peer review.

Finally, Plaintiff says that his adjudicators were biased against him. Plaintiff points out that due process is not met where the adjudicator has been the target of abuse or criticism from the person he is to evaluate, and where the adjudicator has a pecuniary interest in the outcome. *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975). Plaintiff asserts that Mazzaferri and Ungerleider were both key participants in his peer review and that they harbored ill-will toward him because of his complaints regarding research funding and the sharing of overhead expenses among the DMF practice group members. Plaintiff also says that all the physicians in the Division and the Department of Internal Medicine who participated in the peer review had a pecuniary interest in seeing his privileges revoked because they would inherit his patients and would benefit from the revenues generated from them.

#### b. Resolution

Plaintiff was given ample opportunity to be heard. The MSAC held three days of

19

hearings. While Plaintiff did request a continuance of the hearings because of his shoulder surgery, the request was reasonably denied because the MSAC was having difficulty in rescheduling the hearings. Moreover, the MSAC noted that Plaintiff's recovery from surgery was not preventing him from engaging in everyday activities, such as seeing patients. After receiving the denial, Plaintiff did not show up for the first two days of the hearing. Despite his absence, the MSAC provided Plaintiff with copies of the transcripts from the days he was not present and he was allowed to submit a written response to the testimony of Schuller and Silverman. Plaintiff submitted a written response to Silverman's testimony.

Moreover, Plaintiff attended the third day of the hearings with his attorney. Weiss testified and was cross-examined by Plaintiff. Plaintiff also had the opportunity to respond case by case to Weiss's testimony regarding his review of patient charts and answer questions posed by MSAC members regarding those patients. Finally, Plaintiff presented his defense for approximately three hours.

Furthermore, Plaintiff was given additional procedural protection through his appeals to The Ohio State University President, William Kirwan, and to the University Board of Trustees. *Cf. Leary v. Daeschner,* 228 F.3d 729, 744 (6th Cir. 2000) (plaintiffs receive sufficient procedural due process in part where they may participate in post-deprivation grievance procedures).

Next, we agree with the district court that Plaintiff's allegations of bias against Mazzaferri and Ungerleider are simply too attenuated to establish a genuine issue of fact as to his procedural due process claim. While Mazzaferri did initiate the inquiry into Plaintiff's patient care, he quickly referred the review to Bay. Mazzaferri did not review Plaintiff's patient care any

20

further and he did not sit on the MSAC. MSAC Roster (J.A. 1713.) Likewise, while Ungerleider attended the CQM Committee meeting in June of 1997 and requested that the three-member panel conduct a more extensive review of Plaintiff's patient care, he did not personally review Plaintiff's patient care, and he did not sit on the MSAC. Moreover, temporal proximity is lacking between Mazzaferri's and Ungerleider's affiliation with the University and the MSAC's decision. Mazzaferri retired in July of 1999, almost two years before the MSAC reached its decision. Ungerleider left the Division in August of 1997 and left The Ohio State University several months before the MSAC hearings.

Moreover, there is ample evidence to refute Plaintiff's contention that there was ill-will between him and Mazzaferri and Ungerleider. For instance, Ungerleider wrote Mazzaferri a letter encouraging him to promote Plaintiff to the rank of professor of internal medicine in November of 1994. Likewise, Mazzaferri wrote a letter in support of Plaintiff's application to take the Internal Medicine Boards in March of 1996. Moreover, both Ungerleider and Mazzaferri recommended the approval of Plaintiff's application for reappointment to the medical staff with full privileges in 1995, and initially approved his 1997 application for reappointment.

Finally, Plaintiff's claim that the physicians from his division and department who participated in his peer review had a pecuniary interest in the outcome of the case lacks merit. Plaintiff has presented no evidence to support his assertion that these physicians were biased, and bias is not to be presumed. *See Richards v. Emanuel County Hosp. Auth.*, 603 F. Supp. 81, 85 (S.D. Ga. 1984 )( "peer review by members of the medical staff . . . does not automatically violate the requirement of due process, and [the court is] unwilling to presume that the possibility of financial gain would motivate the individuals of the staff to act in an arbitrary and capricious

21

manner”).

## B. SUBSTANTIVE DUE PROCESS

### 1. Standard

This Court recently discussed substantive due process rights in *Bell v. Ohio State Univ.*,

351 F.3d 240, 249–251 (6th Cir. 2003), explaining that:

> The interests protected by substantive due process are of course much
> narrower than those protected by procedural due process. Most property interests
> warranting the protection of procedural due process, for instance, may be
> substantively modified or abolished by the legislature. *See, e.g., Atkins v. Parker*,
> 472 U.S. 115, 129-31 (1985). Interests protected by substantive due process,
> which the legislature may not infringe unless supported by sufficiently important
> state interests, include [1] those protected by specific constitutional guarantees,
> such as the Equal Protection Clause, [2] freedom from government actions that
> “shock the conscience,” *see Braley v. Pontiac*, 906 F.2d 220, 224–25 (6th Cir.
> 1990), and [3] certain interests that the Supreme Court has found so rooted in the
> traditions and conscience of our people as to be fundamental. *See, e.g.,
> Youngberg v. Romeo*, 457 U.S. 307, 321-23 (1982) (right to reasonable care and
> safety while in government custody) . . . .

### 2. Argument

Plaintiff argues that he possesses substantive due process rights in practicing medicine

and maintaining his medical privileges. Plaintiff points out that the Supreme Court and this

Court have “long held that the ‘freedom to choose and pursue a career, to engage in any of the

common occupations of life, qualifies as a liberty interest which may not be arbitrarily denied by

the State.’ ” *Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir. 1989) (quoting *Wilkerson v. Johnson*,

699 F.2d 325, 328 (6th Cir. 1983)); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Plaintiff asserts that the James Institute's decision to report to the NPDB that he is

"incompetent" was arbitrary and capricious, and conscience-shocking. Plaintiff says that while

he may not meet the “academic” or “tertiary” standard of care imposed by the James Institute,

22

there was no dispute that he met the standard of care in the community–that of a Columbus, Ohio, oncologist/ hematologist. Plaintiff says that the report has effectively barred him from practicing medicine anywhere. He supports his assertion with the deposition testimony of Drs. Hodgson and Newtonm, who both participated in his peer review. Both state that it would be quite detrimental to a physician's career to be labeled incompetent.

### 3. Resolution

We agree with the district court's dismissal of this claim. Plaintiff compares his case to the facts in *Meyer* and *Wilkerson*. In *Meyer*, 262 U.S. at 396-98, the Supreme Court found that the substantive due process rights of language teachers in Nebraska were violated where a state law prohibited them from teaching German at any school in the state. In *Wilkerson*, 699 F.2d at 326-27, this Court found that the substantive due process rights of barbershop license applicants were violated where the applicants were unable to obtain their licenses because of the intentional misapplication of a licensing law by licensing board members. These cases involved far-reaching bans on entering into or practicing within a profession that amount to the denial of the choice of one's career. Plaintiff's circumstances are distinguishable. Plaintiff is not barred from practicing medicine generally. Instead, he is barred from practicing at one institution–The Ohio State University. The record reflects that the State Medical Board determined that no further disciplinary action was required, and Plaintiff retains his medical license in Ohio. Furthermore, Plaintiff has presented no evidence that the NPDB report has prevented him from practicing elsewhere. Instead he proffers the deposition testimony of Hodgson and Newton who opine that it would be difficult for a doctor who had been labeled incompetent to find work. The testimony of Hodgson and Newton, however, is inadmissible as it lacks foundation and does not show

23

personal knowledge as to whether Plaintiff has in fact had any difficulty in finding a new position because of the NPDB report. *See* Fed. R. Civ. Proc. 56(e).[9]

We find instead that Plaintiff's circumstances are comparable to the facts in *Parate*, 868 F.2d at 823-26. There, an untenured college professor claimed that his substantive due process rights had been violated after he was fired from his position as a lecturer for allegedly arbitrary reasons. This Court held that the plaintiff's termination from a single college did not amount to the denial of his career choice, because he could "pursue the teaching profession at any public or private university that requests his services." *Id.* at 832. Like the plaintiff in *Parate*, Plaintiff is free to pursue the practice of medicine anywhere in Ohio that requests his services, except at The Ohio State University.

Thus, the remaining issue before the Court is whether Plaintiff has a liberty interest in retaining his medical privileges at The Ohio State University. We find no authority to support this argument. To the contrary, *Parate* specifically held that while there may be a liberty interest in *entering* a profession of one's choosing, there is not a liberty interest in remaining free from regulation while engaged in that profession. *Id.* at 827, 831-832 ( nontenured professor "did not escape reasonable supervision in the manner in which she conducts her classes or assigns her grades"). Accordingly, the regulation of Plaintiff's conduct while engaged as a physician at The Ohio State University implicates no substantive due process rights.

---

[9] Rule 56 (e) provides that:

> supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Finally, Plaintiff's argument that the revocation of his medical privileges and the subsequent report to the NPDB were conscience-shocking goes against the weight of the record, which shows that an extensive evaluation was undertaken to determine whether Plaintiff's medical privileges should be revoked based on his level of clinical competency.

## C. NATIONAL ORIGIN DISCRIMINATION

### 1. The Legal Standard

Title VII, 42 U.S.C. § 2000e-2(a)(1), makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." To establish a national origin discrimination claim under 42 U.S.C. § 1983, a plaintiff is required to either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003). Plaintiff asserts that he can make out a prima facie case of national origin discrimination by both direct and indirect evidence. We disagree for the following reasons.

### 2. Direct Evidence of Nation Origin Discrimination

#### a. Argument

Plaintiff maintains that the six instances of discrimination described in the facts, *see supra* Section I.C., constitute direct evidence of discrimination. Plaintiff focuses especially on Bloomfield's alleged comment that he was a "bloody foreigner" who did not understand the "American way." Plaintiff says that Bloomfield played an important role in the revocation of his medical privileges because she was the director of his division and, in this capacity, was

25

required to meet with him pursuant to the James Bylaw, and also had the ability to stop his peer review.

### b. Resolution

We agree with the district court that Plaintiff has not provided direct evidence of discrimination. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson*, 319 F.3d at 865 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* Discriminatory comments can constitute direct evidence of discrimination provided that they were made by an individual involved in the decision-making process regarding the plaintiff's employment. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). Conversely, comments made by individuals not involved in the decision-making process do not constitute direct evidence of discrimination. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002).

Bloomfield's alleged comments do not constitute direct evidence of discrimination. First, Bloomfield was not a decision-maker in Plaintiff's peer review. While Bloomfield did meet with Plaintiff to go over the findings of the Investigative Committee, she did not review Plaintiff's patient care nor did she sit on the MSAC. Next, Plaintiff has not shown how Bloomfield's alleged comments influenced or tainted the MSAC's decision. There is no evidence that members of the MSAC knew of the alleged comments. Second, temporal

26

proximity is lacking between the alleged comments and the MSAC's decision. Bloomfield

spoke to Plaintiff in December of 1997, while the MSAC hearings were not held until April of

2001. Finally, contrary to Plaintiff's assertion, the facts do not indicate that Bloomfield's

recommendation to suspend Plaintiff caused the MSAC to revoke Plaintiff's medical privileges.

Schuller rejected Bloomfield's suggestion and instead ordered two additional independent

reviews of Plaintiff's patient treatment before concluding that Plaintiff's medical privileges

should be revoked.

We also agree with the district court that the five other alleged instances of

discrimination do not constitute direct evidence of discrimination. None of the comments were

made by decision-makers (members of the MSAC) during the relevant decision-making process

(the MSAC hearings).

### 3. Indirect Evidence of National Origin Discrimination

### a. The Legal Standard

In evaluating a claim of indirect employment discrimination based on national origin, we

employ the burden-shifting approach first announced in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802 (1973). *McDonnell Douglas* requires Plaintiff to establish that (1) he is a

member of a protected class; (2) that he suffered an adverse employment action; (3) that he was

qualified for the position; and (4) that he or was replaced by someone outside the protected class

or was treated differently than similarly-situated, non-protected employees. *Id.* at 802.

If a plaintiff successfully establishes a prima facie claim, the burden then shifts to the

defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse action]." *Id.*

Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to

27

prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

The parties do not dispute that Plaintiff has established the first two elements of the prima facie test. However, the parties disagree on whether Plaintiff meets the third and fourth requirements of the test.

**b. Whether Plaintiff Was Qualified to Retain His Medical Privileges**

**i. Argument**

Plaintiff argues that the district court's finding that he had failed to establish that he was qualified to retain his medical privileges based upon the *results* of his peer review was in error. The district court relied on *Yashon*, 825 F.2d at 1022, where this Court, in reviewing the plaintiff's procedural due process claim, held that a physician's qualifications are subjective and it is not the Court's province to review the merits of a charge against a physician. Accordingly, courts "generally afford great deference to the decision of the hospital's governing body concerning the granting of hospital privileges. " *Id.* (internal quotation omitted).

Plaintiff argues that the district court's approach is contrary to Sixth Circuit precedent, which requires a court to consider a plaintiff 's qualification "*prior* to the onset of the events that the employer cites as its reasons for termination." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 662-63 (6th Cir. 2000). This is because a court "must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge." *Cicero v. Borg-Wagner Automotive, Inc.*, 280 F.3d 579, 585 (6th Cir. 2002). Moreover, a plaintiff must establish only the objective qualifications of a position to

28

satisfy the third prong of the *McDonnell Douglas* test. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003). Plaintiff says that considering his educational background and research work, he met the objective criteria required for medical privileges.

### ii. Resolution

The district court erred in finding that Plaintiff was not qualified to retain his medical privileges based solely on the *results* of the peer review process. There are important reasons for analyzing a plaintiff 's qualifications from a point prior to the onset of the employer's adverse action when plaintiff claims national origin discrimination. In *Wexler* this Court stated:

> [A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

317 F.3d at 574 (citing *Cline*, 206 F.3d at 660-61). Similarly, the employer's subjective criteria may mask discrimination. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. 1998) ("courts traditionally treat explanations that rely heavily on subjective considerations with caution").

In an employment discrimination case, the inquiry concerns the legitimacy of the action against the employee and whether it was based on impermissible considerations. To conclude that Plaintiff was not qualified to retain his medical privileges based on the results of his peer review would prevent the Court from ever reaching that issue.

Turning to the facts, we find that prior to the MSAC's determination that his medical privileges should be revoked, Plaintiff met the objective qualification for retaining them. We note that:

> The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Wexler*, 317 F.3d at 575–76. Here, Plaintiff graduated from a licenced medical school, completed a residency program and other post-graduate training, and is licensed in Ohio to practice medicine without restriction. Moreover, he was found to be qualified to receive medical privileges when he was hired, and these privileges were renewed one time prior to his peer review.

### c. Whether Plaintiff Was Treated Differently than Similarly Situated Persons Outside His Protected Class.

### i. Introduction

The next inquiry is whether Plaintiff was treated less favorably than similarly-situated American-born physicians.[10] Because the district court found that Plaintiff was not qualified to retain his medical privileges, it did not analyze this element. Plaintiff did not address the merits of this element in his appellate brief, although it was fully briefed before the district court. The defendants addressed the merits of this issue in their appellate brief and argue that Plaintiff has waived his arguments concerning this element by not addressing it in his appellate brief. *See, e.g., FSLIC v. Haralson*, 813 F.2d 370, 373 n.3 (11th.Cir. 1987). Plaintiff responded in his reply brief that it is inappropriate for the panel to address this issue, as the district court did not pass upon it. *See, e.g., Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp.*, 884 F.2d 80, 86 (3d

---

[10] Plaintiff does not argue that he was replaced by someone outside the protected class.

Cir. 1989).

We find that Plaintiff did not waive appeal of this issue, as it was not determined by the district court. Next, we will address this issue, as it was fully briefed before the district court and on de novo review, an appellate court may base its decision on anything contained in the record before it. *City Mgmt. Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 251 (6th Cir. 1994).

## ii. The Legal Standard

In *Hatchett v. Health Care & Retirement Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006), the court aptly summarized the considerations for determining whether a plaintiff's suggested comparables are similarly situated:

> As this Court first explained in *Mitchell v. Toledo Hosp.*, when the plaintiff lacks direct evidence of discrimination, the plaintiff "must show that the 'comparables' are similarly-situated *in all respects*." 964 F.2d 577, 583 (6th Cir.1992) (emphasis in original). This Court further explained, in *Ercegovich v. Goodyear Tire & Rubber Co.*, that the plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;'" rather, the plaintiff and the employee with whom the plaintiff seeks to compare herself "must be similar in 'all of the *relevant* aspects.'" 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). This means the plaintiff must "prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of [the non-protected] employees whom he alleges were treated more favorably." *Pierce*, 40 F.3d at 802.

Specifically, in *Mitchell*, 964 F.2d at 583, we explained that to be deemed similarly situated:

> the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

## iii. Argument

31

**Plaintiff's Arguments**

Plaintiff argued to the district court that he was similarly situated to six physicians. Each suggested comparable has been identified by a number.

**Physician No. 123**: Plaintiff says that he was similarly situated to Physician No. 123, an American-born hematologist and oncologist who worked in the same division during the same time period, under the same supervisors. Physician No. 123 treated a patient, VR, with chemotherapy. VR was subsequently re-admitted with arterial fibrillation (abnormal heart rhythms). Plaintiff asserts that an overdose of chemotherapy can cause arterial fibrillation. Plaintiff points out that Physician No. 123's Performance Based Credentialing Profile includes a reference to VR's case being referred to a peer review committee. Plaintiff however says that there are no records demonstrating that any action was ever taken against Physician No. 123, and Physician No. 123 stated at his deposition that he was not subject to any review regarding VR. Thus, Plaintiff says that Physician No. 123 was treated more favorably than he because while it appears that Physician No. 123 had quality-of-care issues, a peer review was not pursued.

**Physician No. 112**: Plaintiff also says he was similarly situated to Physician No. 112, an American-born hematologist and oncologist who worked in the same division during the same time period, under the same supervisors. Plaintiff says that in June of 1995, Physician No. 112 provided an unjustified blood transfusion to patient RE. Physician No. 112's Performance Based Credentialing Profile refers to concerns about his care of RE. Plaintiff however points out that there are no documents demonstrating that an investigation of Physician No. 112's care of RE took place. Thus, Plaintiff says that Physician No. 112 was treated more favorably than

he because while it appears that Physician No. 112 had quality-of-care issues, a peer review was not pursued.

**Physician No. 114**:  Plaintiff says that Physician No. 114  is an American-born hematologist and oncologist.[11]  Plaintiff says that in 1996, Physician No. 114's treatment of patient LG was questioned.  Plaintiff does not specify why Physician No. 114's patient treatment was questioned.  Plaintiff points out that there are no documents demonstrating that Physician No. 114's care of LG was investigated.

Plaintiff also points out that Physician No.114's Credential Profile in 1999 revealed a higher percentage of non-acute days for patients than his peer group.[12]  Apparently, Physician No. 114 was contacted, but no investigation was performed.  Thus, Plaintiff says that Physician No.114 was treated more favorably than he because while it appears that he had quality-of-care issues, a peer review was not pursued.

**Physician No. 139**:  Plaintiff says that Physician No. 139 is an American-born hematologist and oncologist in the same division under the same supervisors.  Physician No. 139 was subject to peer review because he had problems with chemical dependency.  In August of 2002 he entered into a consent decree with the Ohio State Medical Board in which he was subject to monitoring by the Department of Internal Medicine.  Under the consent decree, a department physician had to review Physician No. 139's patient charts on a quarterly basis and report to the State Medical Board.  The Credentials Committee recommended that Physician No.

---

[11]  Plaintiff does not specify whether Physician No. 114 worked in the same division during the same time period or whether he was subject to the same supervisors.

[12]  The record does not include an description of the term "non-acute."

33

139 be reappointed pursuant to the consent decree.

Plaintiff also says that Physician No. 139 settled at least one medical malpractice action.[13]  Plaintiff says that the settlement demonstrates that Physician No. 139's patient care was negligent and worse than his patient care because he was never deemed to be negligent. Moreover, Plaintiff also asserts that he had more potential for rehabilitation than Physician No. 139 because he did not have to overcome problems with chemical dependency.

Plaintiff says that Physician No. 139 was treated more favorably than he was because although it appears he had quality-of-care issues and was even deemed negligent, his medical privileges were not revoked.  The Department of Internal Medicine instead agreed to monitor Physician No. 139's activities, whereas they refused to monitor Plaintiff's activities.

**Physician No. 144**:  Plaintiff says that Physician No. 144 is an American-born pulmonologist and a member of the Department of Internal Medicine who was also supervised by Mazzaferri.  Plaintiff says that Physician No. 144 was subject to peer review because of numerous concerns about his patient care, including the inappropriate use of chemotherapy,[14] stemming from Physician No. 144's problem with chemical dependency.  Plaintiff says that it was ultimately determined that there was insufficient evidence to warrant corrective action against Physician No. 144.  Moreover, Plaintiff points out that Mazzaferri testified on behalf of Physician No. 144 at his peer review hearing.  Plaintiff argues that he was treated less favorably than Physician No. 144 because while it appears that there were several concerns about

---

[13] Plaintiff does not explain what the alleged negligent treatment was.

[14] Besides the inappropriate use of chemotherapy, Plaintiff does not explain the nature of the other patient care issues.

34

Physician No. 144's quality-of-care, his medical privileges were not revoked.

**Physician No. 128**: Plaintiff says that Physician No. 128 is an American-born surgeon practicing at the James Institute who was also supervised by Schuller and Bloomfield. Plaintiff says that Physician No. 128 was subject to numerous peer reviews, and that his medical privileges were limited due to quality-of-care issues.[15] Plaintiff says that Physician No. 128 still practices at The Ohio State University, although he is prohibited from performing cardiac surgeries. Plaintiff says that he was treated less favorably than Physician No.128 because while Physician No. 128 had quality-of-care issues, he was allowed to practice surgery in a limited capacity, while Plaintiff's medical privileges were revoked.

### The Defendants' Arguments

The defendants argue that none of the six physicians discussed above are comparable to Plaintiff because they were reviewed by a different group of decision makers –University Hospital's MSAC, not the James MSAC. The defendants explain that University Hospital is a unit within the Medical Center, but is governed separately from the James Institute. The defendants also note that Plaintiff's case was the only corrective action ever determined by the James MSAC.

**Physician Nos. 123, 112, 114**: The defendants say that Physician No. 123, who Plaintiff suggests caused patient VR's arterial fibrillation; Physician No. 112, who allegedly gave an unjustified blood transfusion; and Physician No. 114, who had a higher percentage of non-acute days for patients than other peer physicians, are not similarly situated to Plaintiff because none of their cases involved an unexplained patient death that implicated the adequacy of the

---

[15] Plaintiff does not explain what these issues were.

35

physician's clinical knowledge, skills, and overall soundness of judgment.

**Physician Nos. 139 and 144**: The defendants argue that Physicians No. 139 and 144 are not comparable to Plaintiff because they were reviewed for patient care problems arising from chemical dependence, not problems with their clinical judgment. The defendants argue that physicians with substance abuse problems are likely to display the correct level of clinical judgment once the problem is addressed.

Moreover, the defendants say that Physician No. 139 was not treated more favorably than Plaintiff because Physician No. 139's patient care was monitored by the Department of Internal Medicine. The defendants point out that the consent decree was issued by the State Medical Board, not by the MSAC, the James Institute, or the Medical Center. Moreover, the physician who checked Physician No. 139's patient charts did not report to the department, but instead to the State Medical Board.

**Physician No. 128**: The defendants argue that Physician No. 128 is not similarly situated to Plaintiff because Physician No. 128 practices in the Department of Surgery –an entirely different department. Moreover, Physician No. 128 is not comparable to Plaintiff because he voluntarily agreed not to perform cardiac surgeries. This agreement obviated the need to further review his patient care. The defendants also say that Plaintiff is not comparable to Physician No. 128 because the review of Physician No. 128 concerned only one aspect of surgical practice – cardiac surgery–while Plaintiff's review was driven forward by concern that there was a fundamental deficiency in his clinical judgment.

### iv. Resolution

We find that Plaintiff is not similarly situated to any of his suggested comparables. First,

while some of the physicians were supervised by the same individuals that supervised Plaintiff, this does not establish that they were similarly situated. This is because Plaintiff's supervisors did not make the decision to revoke his medical privileges–the James MSAC did, and none of these physicians were reviewed by the James MSAC. Therefore, Plaintiff has not established that the decisionmakers in his case treated him differently on the basis of his national origin. Moreover, each physician is not comparable for the additional reasons discussed below:

**Physician No. 123**: Plaintiff has not established that he was similarly situated to Physician No. 123 because there is there is no evidence in the record to suggest that Physician No. 123's treatment of patient VR led to the arterial fibrillation. This conclusion is suggested by Plaintiff himself, and he cites his own declaration as the source of this information. Thus, there is no genuine issue that Physician No. 123 had quality-of care issues.

**Physicians Nos. 112 and 114**: Plaintiff has not established that he was similarly situated to Physician Nos. 112 or 114. Plaintiff has the burden of showing that his suggested comparables "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. Plaintiff urges us to simply accept that all patient care issues are comparable. This is not so. The death of a patient reasonably signals that there might be larger problems with a physician's competency than cases in which patients are not so severely harmed. Plaintiff has wholly failed to establish that Physician No. 112's alleged unjustified blood transfusion, or Physician No. 114's unspecified treatment of patient LG and high number of non-acute days for patients establishes comparable issues of clinical competency as the death of VM did in Plaintiff's case.

37

**Physicians Nos. 139 and 144**:  Plaintiff is not similarly situated to Physician Nos. 139 or 144.  These physicians were reviewed for problems relating to their chemical dependency, not their clinical competency.

Moreover, Plaintiff's assertion that Physician No. 139 was negligent because he settled a malpractice suit is unfounded.  The fact that an individual settles a case does not necessarily lead to the conclusion that the individual was in fact negligent.  A multitude of considerations, not all relating to wrongdoing, may lead an individual to settle a suit.  Here, we have no information regarding the basis of the suit, or Physician No. 130's reasons for settling it.

**Physician No. 128**:  Plaintiff is not similarly situated to Physician No. 128 because he did not practice in the same department.  Moreover, Physician No. 128 voluntarily agreed not to perform limit his practice, thus obviating the need for further review.  There is no evidence that Plaintiff recognized that he had patient care issues and was willing to agree to limit his practice.

Since Plaintiff is unable to establish that he was treated differently than someone similarly situated to him outside his protected class, he has failed to establish a prima facie case of national origin discrimination.

## D.  "CLASS OF ONE"

### 1.  The Legal Standard

The Supreme Court has recognized that the Equal Protection Clause can give rise to a "class of one."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  To present a class of one claim a plaintiff must demonstrate that he has been intentionally treated differently from others who are similarly situated and that there is no rational basis for the difference in treatment. *Id.*  Where a plaintiff succeeds in identifying similarly-situated individuals, plaintiff

must also (1) refute every conceivable basis that might support the government action, or (2) demonstrate that the challenged action was motivated by animus or ill-will. *Klimik v. Kent County Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004).

### 2. Argument

Plaintiff argues that he has established a cognizable class of one claim because he was evaluated under an academic or tertiary standard of care, which is higher than the community standard of care used in negligence cases, and higher than the standard of care used to evaluate other physicians at The Ohio State University. Plaintiff supports his claim by pointing to the deposition statements of Drs. Ungerleider and Hodgson that they were not aware of the application of a standard of care higher than that used in the general community.

The defendants respond that the James Institute has used an academic or tertiary standard of care to conduct peer reviews and also when making credentialing decisions and during peer reviews since 2000. The defendants point out that a peer review form from the James Institute asks the reviewer whether the "care provided was according to the acceptable medical/nursing practice at a tertiary care center?" Likewise, a tertiary standard of care was used to evaluate Physicians Nos. 128 and 144.

The defendants alternatively argue that Plaintiff's class of one claim should not be reviewed at all. They note that many courts have rejected class of one claims in the employment context. *See Lauth v. McCollum*, 424 F.3d 631, 633–634 (7th Cir. 2005) (class of one claims are available in public employee cases only in rare situations); *see also*, *Campagna v. Mass. Dep't of Envtl. Prot.*, 206 F. Supp. 2d 120, 126–27 (D. Mass. 2002) (applicability of class of one to employment claims is "dubious"), *aff'd*, 334 F.3d 150 (1st Cir. 2003). The defendants

urge the Court to reject class of one suits in hospital privileges cases because the analysis is difficult to apply in situations where governmental decision-making necessarily and legitimately involves the exercise of professional judgment and discretion. Instead, class of one claims should be limited to situations in which there is an egregious departure from an objective, generally applicable law or policy.

### 3. Resolution

We need not review the merits of Plaintiff's claim because a class of one claim is not appropriate under these circumstances. In the seminal case *Village of Willowbrook v. Olech*, the plaintiffs sought to connect their property to a municipal water supply. 528 U.S. at 563. The Village typically required a fifteen-foot easement from property owners seeking access to the supply. The Village however conditioned the plaintiffs' connection to the supply upon their granting it a thirty-three-foot easement. *Id.* The Supreme Court held that the complaint sufficiently alleged that the Village's request for the additional eighteen-feet of land was arbitrary because it was motivated by ill-will resulting from the plaintiffs' previous filing of an unrelated, successful lawsuit against the Village. *Id.* Thus in *Olech*, the Supreme Court allowed the plaintiff's class of one claim to proceed because the municipality allegedly deviated without justification from its clear procedure of always requiring the same width for an easement.

This Court has also allowed a class of one claim to go forward in an employment case. In *Bower v. Village of Mt. Sterling*, 44 F. App'x 670, 672 (6th Cir. 2002), the plaintiff claimed that his equal protection rights were violated after he was denied the opportunity to become a police officer. The Village's officers were normally selected through the following process: the police chief nominated candidates for officer positions and the mayor approved them without

question. *Id*. at 673. However, in *Bower*, while the police chief nominated the plaintiff, the mayor struck down the nomination in retaliation to the plaintiff's parents' opposition to him. *Id.* We found that this deviation from a routine hiring process was sufficient to state a class of one claim. *Id.*

Unlike in *Olech* and *Bower*, there is no clear and neutral applicable procedure or standard for determining whether the Plaintiff here should retain his medical privileges. Here, the procedure set forth in the James Bylaws called for multiple physicians to review Plaintiff's patient care and come to a determination as to whether his care was acceptable for an academic or tertiary hospital. Here, the MSAC's decision to revoke Plaintiff's medical privileges was the result of the recommendations and conclusions of several committees and independent reviewers, as well as the testimony and evidence presented at a lengthy hearing. Each reviewer was able to give his or her individual opinion as to the quality of Plaintiff's care, and each member of the MSAC voted individually. This type of review is inherently discretionary, and distinct from the simple decision-making procedures and routines reviewed in *Olech* and *Bower*. Accordingly, we find that Plaintiff's case is not reviewable as a class of one claim.

Finally, we note that although we are not reviewing the merits of Plaintiff's class of one claim, we are certain that neither ill-will nor animus prompted the MSAC's decision. As already determined in Plaintiff's procedural due process claim, there is no evidence of bias due to the alleged tensions between Plaintiff and his colleagues. Likewise, there is no evidence that Plaintiff was discriminated against on the basis of his national origin.

## IV. CONCLUSION

While de novo review of this factually complicated case necessitated this lengthy

41

opinion, we find no genuine issue of material fact as to whether the revocation of Plaintiff's

medical privileges resulted in a violation of Plaintiff's rights.  For the reasons discussed above,

the decision of the district court granting the defendants' motion for summary judgment is

**AFFIRMED**.