NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0308n.06

No. 08-2381

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**May 19, 2010**
LEONARD GREEN, Clerk

LORI CORELL,                                          )
                                                     )
    Plaintiff-Appellant,                         )       ON APPEAL FROM THE
                                                     )       UNITED STATES DISTRICT
    v.                                           )       COURT FOR THE EASTERN
                                                     )       DISTRICT OF MICHIGAN
CSX TRANSPORTATION, INC.                             )
                                                     )
    Defendant-Appellee.                          )
                                                     )

BEFORE:  GRIFFIN and KETHLEDGE, Circuit Judges; and CARR, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiff Lori Corell sued her former employer, CSX Transportation, Inc. ("CSX"), asserting that she was unlawfully terminated because of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e-16.  She appeals the district court's grant of summary judgment in favor of CSX.  Because we hold that Corell neither established a prima facie case of sex discrimination nor demonstrated pretext, we affirm.

I.

In its appealed order granting summary judgment to defendant CSX, the district court accurately reported the relevant facts:

---

[*]The Honorable James G. Carr, Chief Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

Plaintiff Lori Corell worked for Defendant CSX Transportation, Inc., ("CSX") as a brakeman/flagman/conductor, from August 31, 1998, until her dismissal on January 13, 2005. [Doc. 28:9-10]. Plaintiff asserts that she was terminated by either Mr. Tuchek or Mr. Burrus based on her gender[1] [but] has . . . no direct evidence to support [that allegation]. [Doc. 31:9]. When asked what acts Defendant committed to support her allegation that she was wrongfully terminated, Plaintiff responded, "Because they fired me; I should have had the 30 days off[,] and that would have be[en] [] it, and I would have gladly done that. But they had a hearing and then I got a letter and I was fired." [Doc. 28-13:97].

---

[1]Plaintiff originally claimed age and gender discrimination but chose not to further pursue the age discrimination claim. [Doc. 31:9.]

---

Defendant counters that Plaintiff was terminated because of an incident that occurred on November 20, 2004, when Plaintiff allowed a train to enter [i]nto a restricted area of track where a contractor was working; Defendant thus asserts that Plaintiff's termination had nothing to do with gender. [Doc. 28:8-9; Doc. 31:3].

The facts of the incident are largely undisputed. According to Plaintiff, on November 20, 2004, she contacted dispatch and learned that train Q322 was coming up to "Holly Diamond" track. [Doc. 28-15:87]. She resumed her conversation with the foreman when the "defect detector went off." [Doc. 28-15:87]. She "went down to the bridge where the tracks were [. . .] and told the [contractors] to start taking the lift off the tracks." [Id.] The workers acknowledged her and started to move the lift. [Doc. 28-15:92]. When the train asked for permission to enter, the lift was 20-30 feet [Doc. 28-15:92] from being out of harm's way, so Plaintiff "[g]ave the[] [train] permission[,] and as I gave [it] permission, I turned around and realized that [the contractors had] stopped to [. . .] reposition the[ir] [boards] by the tracks and they had never done this before. [Doc. 28-15:87]. As they did that[,] I told [train] 322 [] to ease 'em up [but] [] they were coming around the corner." [Doc. 28-15:87, 92]. Once Plaintiff realized that the train was not going to be able to stop in time, she "told the [contractors] to get out of the way and make sure they were clear." [Doc. 28-15:93]. Although emergency braking was used, the train struck the lift, destroying the contractor's equipment and derailing the train. [Doc. 28-7:2]. One of the contractor's employees was forced to jump off the equipment to avoid being hit. [Doc. 28-7:2]. For the next five hours, the track was blocked while the wreckage was cleared. [Id.] Plaintiff acknowledged in her written statement that she "gave them permission [because she thought] the guys would have enough time to get the lift

off." [Doc. 28-15:87]. Plaintiff further stated that in the past when she had given permission under similar circumstances, the workers had cleared the tracks in that same amount of time. [Doc. 28-15:97].

Although Plaintiff views these former occasions as support for the reasonableness of her conduct that day, Defendant views them as probative of a pattern of violation of policies, since policy dictates that a train not be given permission to enter a track until after any equipment or workers are completely clear of the track. [Doc. 28-15:25, 96]. Plaintiff states that she did not intend to cause injury or damage to any person or property. [Doc. 28-15:96]. The equipment damaged in the accident was valued between $85,000 and $125,000. [Doc. 28-15:56]. The locomotive damage amounted to $2,600. [Dkt. 28-15:56]. Although there were no reported injuries at the time, the train engineer later filed an injury claim. [Doc. 28-7:2].

Plaintiff concedes that her actions that day violated two portions of Defendant's Rule 72, specifically, those provisions that require a flagman to "ascertain which track the approaching movement is located and that all contractor equipment and personnel are clear of that track before permission for rail movement is given" and which provides that when "workers request permission to obstruct a track," the flagman "must not permit movements to enter the work location until the track is no longer obstructed." [Doc. 28-15:25, 94-95].

Martha Gill, Manager of Field Administration, reviewed the facts and prepared a charge letter, advising Plaintiff that a formal investigation hearing would be held. [Doc. 28-11:4]. The hearing was held and the transcript was sent to Plaintiff, Field Administration, the Labor Relations Department, the Division Manager and the Regional Vice President of Defendant corporation for review. [Doc. 28-11:6-9]. Plaintiff was terminated by Pete Burrus, the Division manager, after he consulted with the Field Administration and the Regional Vice President, Tony Tuchek. [Doc. 28-6:3]. Plaintiff asserts that the "ultimate final decision rests with the Vice President of the Northern Region, Tony Tuchek." [Doc. 31:14.].

Plaintiff availed herself of the appellate procedures available under the Collective Bargaining Agreement ("CBA") and the Railway Labor Act, 45 U.S.C. § 151 et seq. [Doc. 28-15:45]. After being denied relief at those levels, Plaintiff filed the instant [lawsuit].

(Doc. 44:2-4) (second and third footnotes and internal citation omitted).

On September 1, 2006, Corell filed a complaint in the Eastern District of Michigan alleging that CSX had unlawfully terminated her because of her sex and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-16, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634. The district court referred her complaint to a magistrate judge.

CSX moved for summary judgment. After conducting a hearing, the magistrate judge recommended granting CSX's motion because, although Corell had established a prima facie case of sex discrimination, she had not offered sufficient evidence of pretext to rebut CSX's non-discriminatory reason for her termination, namely, the November 20, 2004, derailment (hereinafter "2004 derailment" or "Corell's derailment"). Corell filed timely objections to the magistrate judge's report and recommendation (hereinafter "R&R"), which repeated the arguments she had raised in opposition to CSX's motion for summary judgment. CSX responded to Corell's objections. The district court overruled Corell's objections and granted CSX's motion for summary judgment, adopting the magistrate judge's recommended ruling that Corell had not provided sufficient, admissible evidence of pretext.

Corell timely appeals.

II.

First, the parties make much ado over the proper scope of our review. CSX asserts that Corell did not fully comply with 28 U.S.C. § 636(b)(1) when she objected to the R&R, forfeiting her right to appeal. We disagree.

Section 636(b)(1) provides that the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. . . . [and] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* Thus, contrary to CSX's position, § 636(b)(1) does not *require* a district court to adopt an R&R in toto if a party does not raise specific objections to it. The district court evidently concluded that Corell's objections were specific enough for it to conduct a de novo review of the R&R under § 636(b)(1). We conclude that this is a discretionary ruling that lies within the province of the district court. In this regard, if the district court did not reject Corell's objections for non-compliance with § 636(b)(1), then, *a fortiori*, it is not our station to do so. *See generally, Sutton v. U.S. Small Bus. Admin.*, 92 F. App'x 112, 120-121 (6th Cir. 2003) (unpublished) (the scope of a district court's review of a magistrate judge's R&R is within its sound discretion).[1]

Next, Corell argues that we cannot review the district court's decision to adopt the R&R's recommended ruling that she established a prima facie case of sex discrimination. Corell is incorrect. We may affirm the district court's decision to grant summary judgment in favor of CSX on any grounds supported by the record. *Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) (citation

---

[1]Unpublished opinions of this court are not precedentially binding under the doctrine of stare decisis, but may be considered for their persuasive value. *Thompson v. N. Am. Stainless, LP*, 567 F.3d 804, 809 n.2 (6th Cir. 2009) (en banc); *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007). We find *Sutton* persuasive regarding this issue.

omitted).  Moreover, we have on previous occasions elected to review the sufficiency of a plaintiff's

prima facie case before reaching the issue of pretext:

> While the district court recognized the dispute regarding the similarly situated requirement, it elected to assume *arguendo* that a similarly situated Caucasian employee was treated differently and proceeded to grant summary judgment for [Defendant] on the ground that Plaintiff could not establish pretext.  Because this court can affirm a district court's summary judgment decision on any grounds supported by the record, even if different than those relied on by the district court, we find it proper to first consider whether Plaintiff has established a prima facie case.

*Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 480 n.3 (6th Cir. 2008) (unpublished)

(citing *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (holding that we may review the

sufficiency of a plaintiff's prima facie case of discrimination, despite the district court's decision to

reach the issue of pretext)).

Finally, we reject Corell's argument that CSX was required to file a cross-appeal to permit

our review of the district court's adoption of the R&R as it relates to Corell's prima facie case.  "A

cross-appeal is not required where a party does not seek to expand the rights conferred by a favorable

judgment, even if the party's argument involves an attack upon the reasoning of the lower court or

an insistence upon a matter overlooked or ignored by it."  *Javaherpour v. United States*,  315 F.

App'x 505, 509 (6th Cir. 2009) (unpublished) (citing *Olympic Fastening Sys., Inc. v. Textron Inc.,*

504 F.2d 609, 617 (6th Cir.1974)).  In this regard, CSX preserved its right to contest this aspect of

the R&R in its response to Corell's objections, stating that the magistrate judge's recommended

rulings "militate in favor of finding that Corell did not even make out her *prima facie* case . . . .

CSX[] does not waive these arguments, in the event any appeal is filed in this matter."  *See Souter*

*v. Jones*, 395 F.3d 577, 586 (6th Cir. 2005) ("[W]e have held that a party, who substantially prevails in a magistrate judge's recommendation, does not waive the right to appeal secondary issues resolved against him by failing to object to the recommendation.").

For these reasons, we reject Corell's and CSX's arguments seeking to curtail the scope of our review.

III.

We conduct de novo review of a district court's summary judgment determination. *Med. Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 389 (6th Cir. 2008). Summary judgment is appropriate if, taking the evidence in the light most favorable to the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). "A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party." *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A "mere scintilla" of evidence, however, is not enough for the non-moving party to withstand summary judgment. *Id.*

Because Corell did not present direct evidence of discrimination, her Title VII claims are governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as subsequently modified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of unlawful discrimination. *Id.* To establish a prima facie case of sex discrimination, Corell is required

to show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, *or* a similarly situated non-protected employee was treated more favorably. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004) (emphasis added).

Once Corell has made this showing, a burden of production shifts to CSX to present a legitimate, nondiscriminatory basis for its adverse employment decision. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). This explanation must be "legally sufficient to justify a judgment for the defendant." *Id.* (quoting *Burdine*, 450 U.S. at 255). If CSX carries this burden, Corell must "prove by a preponderance of the evidence that the legitimate reasons offered by [CSX] were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. "Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Wright*, 455 F.3d at 707 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

A.

CSX argues that the magistrate judge did not correctly analyze Corell's prima facie case, specifically, whether she established that it treated a similarly situated non-protected employee more favorably. *See Peltier*, 388 F.3d at 987. CSX maintains that the magistrate judge incorrectly ruled that there was a genuine issue of material fact regarding whether Jonathan White ("White"), Corell's male co-worker, was similarly situated to Corell. In this regard, White caused a train derailment in

June 2003, violating Rule 72, but CSX did not terminate his employment, electing instead to suspend

him for thirty days.

The R&R accurately describes the June 2003 incident:

[O]n June 11, 2003, [White] gave permission for a train to enter a track when a contractor's employees had gone to lunch and were not on the track. [Doc. 28-8:2]. After granting permission, an employee of the contractor asked [White] whether any trains were coming. [White] answered affirmatively[,] and the contractor's employee inquired whether the "shields" had been removed. [Doc. 31-2]. The "shields" are wooden fail guards. [Doc. 28-8:2]. [White] stated [that] he had no knowledge either way. The contractor looked down from the bridge to the roadbed and saw the "shields" still in place. [Doc. 31-2.]. [White] attempted to contact the train twice to inform the train to stop but he was unsuccessful. The train continued forward, hit the shields, and derailed. The [White] incident was investigated by Dan Miklos, Superintendent of Operations, and Ms. Gill was the Field Administrator who notified [White] of the formal investigation. [Doc. 28-8:1-2]. The [White] incident resulted in approximately $758,000 worth of damage and the crew members who were trapped inside the engine by debris had to be rescued by emergency personnel. [Doc. 31-2]. One crew member was admitted to the hospital with critical injuries, including a torn aorta. *Id.* [White] had worked for [CSX] for 3.5 years at the time of the incident. [White] had one prior "missed call" on his employment record at that time. [*Id.*]

CSX contends that, although White also caused a derailment, he was not sufficiently "comparable" to Corell because: (1) different decision-makers participated in the disciplinary decisions involving Corell and White; (2) Corell and White had different supervisors; (3) Corell had a history of safety violations, whereas White had been disciplined only once for tardiness; and (4) Corell's conduct was more severe than White's insofar as White's derailment was based upon misinformation he received from a contractor's employee.

"In employment discrimination cases, the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment [] for the two to be considered 'similarly

situated;' rather, this court has held that the plaintiff and the employee with whom the plaintiff seeks

to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Knox v. Neaton Auto*

*Prods. Mfr., Inc.*, 375 F.3d 451, 458 (6th Cir. 2004) (citing *Ercegovich v. Goodyear Tire & Rubber*

*Co.*, 154 F.3d 344, 353 (6th Cir. 1998)). Thus, to establish a prima facie case of sex discrimination,

Corell must point to at least one similar male employee guilty of conduct of "comparable

seriousness" to the conduct for which she was fired, but whom management treated more leniently.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In this regard,

> [w]e have held that to be deemed 'similarly-situated' in the disciplinary context, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Ercegovich*, 154 F.3d at 352 (citation and internal quotation marks omitted).

First, the parties do not dispute that Corell and White were disciplined by different decision-

makers and that, at all relevant times, they had different supervisors.[2] Thus, they are not comparable

under the first element. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762-63 (6th Cir. 2000) (holding

that plaintiff and comparable employee were not similarly situated as a matter of law where they

were disciplined by different ultimate decision-makers); *Barry*, 276 F. App'x at 480 (same).

---

[2]Corell alleged that Mr. Tuchek was the final decision-maker, while CSX maintains that Mr. Burrus made the final decision. The magistrate judge, however, correctly ruled that this factual determination was immaterial because neither Mr. Burrus nor Mr. Tuchek were involved or informed of the disciplinary action taken against White.

More important, however, is Corell's employment record, which reveals a history of repeated safety violations. Specifically, in addition to "missed calls" in August 2001 and March 2002, CSX disciplined her on three separate occasions for violating safety rules, including a "time-out" in April 2002 for "mounting moving equipment" and in December 2002 for "bringing an engine ahead without checking the switch," which caused a train derailment. In this regard, Corell's employment record reveals at least one previous derailment before the 2004 derailment for which she was fired. In stark contrast, White's disciplinary record reveals only one, non-safety related violation, specifically, a "missed call," before his June 2003 accident. Thus, at the time of their respective derailments, Corell had established a pattern of violating CSX's safety rules – a disciplinary past that White did not possess.

Finally, we agree that the degree of culpability in Corell's derailment is relevant in ascertaining whether White's derailment is of "comparable seriousness." *See Mitchell,* 964 F.2d at 583. As CSX points out, White never authorized the train to pass without first determining that the contractor's employees had vacated the track. In White's derailment, a contractor's employee had informed him that "the track was clear." Following CSX's investigation, it was determined that "the contractor left rail shields on the track without informing White and the shields caused the train to derail." Moreover, "White believed the track was clear and did not know that the rail shields were on the track at the time he gave permission for the train to pass."

Conversely, Corell simply assumed that the contractor's employees had enough time to vacate the track when she authorized the train to pass. Thus, unlike White, Corell did not know

whether the employees had actually cleared the track. In short, White's derailment was, in large part, caused by misinformation he received from a contractor's employee. Corell's derailment, on the other hand, was caused by her own dangerous assumption.

Even in light of the greater property damage caused by White, Corell's aggregate safety violations, coupled with her decision to allow the train to pass despite not knowing whether the contractor's employees had vacated the track, establishes "differentiating . . . circumstances that [] distinguish[ed] [her] conduct [and] [CSX's] treatment of . . . it" from CSX's treatment of White. *Ercegovich*, 154 F.3d at 352.

For these reasons, we hold that Corell failed to establish a prima facie case of sex discrimination because she did not produce a similar, non-protected employee that was guilty of conduct of "comparable seriousness" to the conduct for which she was fired, but whom CSX treated more leniently. *Mitchell*, 964 F.2d at 583; *Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 127 (6th Cir. 2007) (unpublished) (suggested comparables were not similarly situated where plaintiff was on probation while other employees who committed the same act were not on probation); *Benjamin v. Brachman*, 246 F. App'x 905, 926 (6th Cir. 2007) (unpublished) (suggested comparables were not similarly situated because, although supervised by the same supervisor, the decision to revoke medical privileges was not made by the same decision-maker, and the medical treatment of their patients led to problems of differing severity); *Walker v. Ohio Dep't of Rehab. and Corr.*, 241 F. App'x 261, 267 (6th Cir. 2007) (unpublished) (suggested comparable was not similarly situated where he answered to different supervisor, was not in a supervisory position (as was plaintiff), and

plaintiff's "exercise of poor judgement, which exposed an inmate to further physical abuse" was "vastly different misconduct" than the suggested comparable's "err[or] by not taking appropriate steps to prevent it.").

B.

Nor did the district court err in ruling that Corell failed to demonstrate pretext. In opposing a motion for summary judgment, Corell bears the burden of demonstrating pretext by submitting admissible evidence showing that CSX's proffered reason for her termination – the 2004 derailment – either: (1) had no basis in fact, (2) did not actually motivate its action, or (3) was insufficient to motivate its action. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004). In other words, the burden falls upon Corell, not CSX, to identify admissible evidence from which a reasonable jury could find that CSX's stated reason was a lie contrived to conceal its true reason for terminating her employment – that she is a woman. *See Burdine*, 450 U.S. at 253.

As evidence of pretext, Corell points to the statements and an on-site investigation report prepared by Aaron J. Erdman, CSX's Line of Road Trainmaster. Shortly after his on-site inspection of Corell's derailment, Erdman informed her "not to worry," because CSX would likely suspend her for "thirty days" only. In a preprinted form attached to his report, Erdman categorized Corell's derailment as "life critical," as opposed to CSX's most serious accident category, "egregious." According to CSX's disciplinary chart, life-critical infractions warrant a thirty-day suspension, whereas egregious violations can result in termination. (Appellant Br. 16; Doc. 31-2). Nonetheless,

several days after completing his written report, Erdman sent an e-mail to Tuchek and others stating that Corell's accident was "to be considered an egregious act[.]"

CSX responds that Erdman could not categorize Corell's accident as "egregious" because he filled-out a preprinted form that did not contain an "egregious" category. Tuchek testified that Erdman's form did not contain an "egregious" classification, and the record verifies his statement. Thus, Tuchek did not "switch" the classification from "life critical" to "egregious" because "egregious" was not an option available to Erdman.

During his deposition, Tuchek testified that he categorized Corell's accident as "egregious" because he needed to make a decision about whether to "pull her out of service," or keep her active:

> Now my decision was based on the fact that we could have easily killed that guy who was up in that bucket. We could have hurt or killed our own people. We could have done damage. We could have had an explosion. . . . Now, if I leave her in service and she goes to work tomorrow and the same thing happens, I'm crucified. Not only am I crucified, but – not only me, but the company, the carrier is crucified.
>
> My decision was that we were going to take her out of service. So how do I take her out of service? The labor agreement says that I cannot take her out of service prior to a fair and impartial hearing unless it's a serious and egregious offense. So we classified – because of the incident and the circumstances surrounding the incident, we classif[ied] it as an egregious offense so I ha[d] the ability to take her out of service pending the formal investigation.

Thus, Erdman's classification of Corell's derailment as "life critical" is not inconsistent with CSX's determination that the derailment was not only "life critical," but "egregious," necessitating that CSX take her "out of service."[3]

---

[3]Notably, Corell does not challenge CSX's stated position that Erdman plays no role in CSX's disciplinary decision-making process. Moreover, Erdman's statement to Corell, offered

The letter written by Rocky Rumpel, a brakeman for CSX, also fails to demonstrate pretext. After CSX terminated Corell, Rumpel resigned from his position on the union's safety committee. Rumpel's letter stated that he disagreed with the harshness of Corell's discipline for two reasons: (1) because he felt that a thirty-day suspension was more appropriate; and (2) that it would "set us back with the trust we have earned between Labor and Management." Thus, there is no indication in Rumpel's letter that he thought that CSX's decision was motivated by a desire to discriminate against Corell because of her gender.

Finally, Corell claims that CSX has never fired another employee for violating Rule 72. An affidavit filed by Terri Schray, Director of Human Resources for CSX, belies this claim. In total, from January 2000 – November 2004, CSX terminated fourteen employees for safety-related violations – and only one of them was female. Corell's attempt to draw an artificial line between Rule 72 violations and other safety infractions is not persuasive because she offers no meaningful method upon which to draw this distinction. The fact that CSX routinely fires employees, both male and female, for safety violations demonstrates that it takes such violations very seriously.

The salient issue in a Title VII claim of discrimination is whether the plaintiff was singled out because of her membership in a protected class and treated less favorably than those outside of that class, not whether she was treated less favorably than "someone's general standard of equitable treatment." *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir.1988) (citations omitted). In this regard,

shortly after his on-site inspection of the 2004 derailment, was based upon his individual assessment of the accident itself – not upon Corell's employment history as a whole.

when CSX asked Corell what acts it had committed to support her allegation of sex discrimination, she responded, "Because they fired me, I should have had the 30 days off and that would have be[en] it, and I would have gladly done that. But they had a hearing and then I got a letter and I was fired." Thus, Corell asks us to second guess CSX's employment decision, not because she offers admissible evidence that indicates CSX's gender bias, but because she feels that she was treated unfairly. "Time and again we have emphasized that [o]ur role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 399 (6th Cir. 2009) (internal citation and quotation marks omitted) (Griffin, J. dissenting). Corell's proffered evidence does not demonstrate that her termination was committed out of CSX's desire to discriminate against her based on her sex. Because Corell has not met her burden, the district court properly granted summary judgment in favor of CSX.

IV.

For these reasons, we affirm the judgment of the district court.