NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0142n.06

No. 24-3571

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 12, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| TRACY WALENCIEJ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| EASTERN OHIO CORRECTION CENTER, | ) | |
| | ) | OPINION |
| Defendant-Appellee. | ) | |
| | ) | |

Before: COLE, WHITE, and MATHIS, Circuit Judges.

**PER CURIAM.** Plaintiff-Appellant Tracy Walenciej appeals the grant of summary judgment in favor of her former employer, Defendant-Appellee Eastern Ohio Correction Center (the EOCC), in this action alleging that the EOCC engaged in sex discrimination when it terminated Walenciej's employment. We AFFIRM.

## I. Background

### A. Factual Background

*1. Walenciej's Tenure as Program Manager and Deputy Director*

The EOCC is a community-based correctional facility (CBCF) established under Ohio law. Ohio Rev. Code §§ 2929.01(D), 2301.51–58. As a CBCF, the EOCC "provides residential correctional-related services to felony offenders, including but not limited to services such as prison diversion, substance abuse addiction assistance, education assistance, and programs for community service." R. 24-1, PID 84. The EOCC has two locations—one in Wintersville, Ohio, and one in Lisbon, Ohio—and served six counties at the time of the events underlying this case.

Two boards administer the EOCC. The Facility Governing Board (FGB) oversees the EOCC's general operations. Ohio Rev. Code. § 2301.51(A)(3)(c). And the Judicial Advisory Board (JAB), comprised of Ohio state-court judges, appoints two-thirds of FGB members and advises the FGB on community needs, admission criteria, and other "general requirements." *Id.* §§ 2301.51(A)(3)(c), (E). "[T]he board or boards of county commissioners of the member counties [] appoint the remaining one-third . . . of the members." *Id.* § 2301.51(E).

The FGB hires and supervises an Executive Director who "ha[s] general charge of" the EOCC and runs its daily operations. *Id.* § 2301.55(A)(1). At all times relevant to this case, the EOCC's Executive Director was Eugene Gallo. His most recent term of employment was from 2016 to 2020. Phillip Nunes has since replaced Gallo as Executive Director.

Walenciej has a master's degree in social work and is a Licensed Independent Social Worker with Supervisory Status (LISW-S) in the state of Ohio. She worked at the EOCC from 2006 until April 2020. After serving as a program administrator beginning in 2006, Walenciej became Deputy Director in 2014. As Deputy Director, Walenciej reported to Gallo and assisted him with general operations, including hiring and disciplinary decisions. She also acted in Gallo's stead when he was absent. While she was Deputy Director, Walenciej consistently received "exceptional" (the highest rating available) and "advanced" (the second-highest rating available) ratings on her performance evaluations.

As Deputy Director, Walenciej initiated and oversaw the EOCC's Vivitrol Program, under which healthcare providers administer intramuscular injections of naloxone, a prescription drug treatment for opioid addiction. Walenciej recruited Frank Vostatek, a nurse practitioner and pharmacist, to administer the Vivitrol Program.

Walenciej testified during discovery that her colleagues treated her differently based on her sex throughout her time at the EOCC. Gallo made comments about how attractive she was and bypassed her by delegating decisionmaking authority to her male subordinates. One of Walenciej's male subordinates and Joe Shipbaugh, Walenciej's predecessor as Deputy Director, referred to her privately by cupping their hands around their chests to mimic breasts. Other colleagues joked and/or gossiped about her supposedly engaging in sex acts at work. And Gallo, Shipbaugh, and other senior male staff met regularly in Gallo's office to gossip, complain about their wives, and sometimes discuss EOCC administrative matters. On at least one occasion, someone posted a handwritten sign reading "He-Man Woman-Haters Club"—a name that both attendees and other EOCC staff regularly used to refer to those meetings—on Gallo's door while the men were meeting. R. 24-4, PID 189–93. When Walenciej expressed concerns about these behaviors to Gallo, he directed Walenciej to speak to one of the employees who spread the joke about her engaging in sex acts at work but took no other action.

2. *Walenciej's Promotion and Subsequent Complaints*

In 2019, Gallo outlined a transition plan that called for him to retire at the end of 2020 and Walenciej to begin as Executive Director on January 1, 2021. Based in part on Gallo's recommendation, the FGB selected Walenciej to be the next Executive Director.

As news spread about Walenciej's potential promotion to Executive Director, the FGB received nine written complaints—seven anonymous and two signed—about Walenciej, apparently from current and former employees. The complaints alleged that Walenciej bullied and harassed other EOCC employees; regularly used inappropriate language when talking to and about residents and staff; was generally a bad manager; had a romantic relationship with her subordinate Matt Grimard and gave him preferential treatment; hired her friends and gave them preferential

treatment; improperly received a free television from Vostatek; improperly funded the Vivitrol program while employees' health-insurance benefits were being cut; and falsified statistics used to secure grant funding.

After receiving these complaints, the FGB "suspend[ed] contract talk[s]" with Walenciej and "openly advertise[d]" the Executive Director position. R. 32-11, PID 984. It also engaged outside counsel Fishel Downey Albrecht & Riepenhoff, LLP (Fishel Downey), to investigate the complaints. Because several of the complaints were anonymous, Fishel Downey "interview[ed] all resident supervisors, case managers, and programming staff to ensure a thorough investigation." R. 24-5, PID 261. On April 9, 2020, following its investigation, Fishel Downey produced a written report (the Report).

Based on witness statements and Walenciej's admitted conduct, the Report found that Walenciej engaged in harassment, bullying, and unprofessional behavior, in violation of multiple EOCC policies. Walenciej admitted that "she curse[d] in the workplace every day"; "called subordinate employees names" like "motherfucker, dickhead, [and] asshole"; told one employee that she would "punch him in the throat" and another that she would "punch him in the dick"; referred to an employee using "'Hispanic' names"; wrote the phrase "punch her in the cooter" on her desk calendar[1]; and kept a "shitlist" of employees' names displayed in her office.[2] *Id.* at PID 262–63. Several witnesses (including one with whom Walenciej claimed she had an excellent relationship) said Walenciej was a bully who yelled and cursed at them, dismissed their importance by telling them that "monkeys could do their jobs" and they "just push buttons," and belittled and

---

[1] Walenciej says she wrote down this phrase as someone was describing a viral YouTube video so that she could find the video later.

[2] Walenciej maintained that each of these behaviors was acceptable because it was commonplace among EOCC staff and/or just workplace banter.

insulted residents. *Id.* at PID 262–64. And "[n]early all witnesses who testified that they observed Ms. Walenciej engage in inappropriate behaviors stated they did not file a complaint or grievance with [the] EOCC because they were afraid of retaliation from Ms. Walenciej." *Id.* at PID 264.

The Report also found that Walenciej violated the EOCC's hiring and promotional policies when hiring Kristen LaRoche, who previously worked at the pharmacy that administered the Vivitrol program; Patty Allen, who had previously worked with Walenciej; Crystal Chipps, who had previously lived with Walenciej and who Walenciej hired as a Fiscal Manager despite Chipps' having no accounting degree; and Operations Manager Todd Cottrell, who Walenciej promoted from Accounts Manager without interviewing another internal candidate who wanted the job. Walenciej violated the policies by "not post[ing vacant positions] prior to hiring to seek internal candidates"; not posting positions "for the appropriate time period, if at all"; and not considering or selecting internal applicants. *Id.* at PID 266. The allegations of Walenciej giving better pay rates and insurance benefits to certain favored employees were unsubstantiated, however.

The Report found as well that Walenciej dated Grimard and gave him preferential treatment, also in violation of multiple EOCC policies,[3] and kept the relationship secret until months after it ended.[4] Walenciej did not discipline Grimard when he was frequently tardy; falsified his time sheets; missed work; arrived at work hungover; failed to timely complete projects and paperwork; was "verbally aggressive" with Allen, who was his direct supervisor; bypassed Allen to bring questions and requests for advice directly to Walenciej; lied to Walenciej; yelled at

---

[3] Walenciej maintains that the relationship was not improper because the EOCC has no policies expressly prohibiting romantic relationships between employees. Appellant's Br. at 22 (citing R. 24-10, PID 310–814).

[4] Walenciej disclosed the relationship, which lasted from July 2018 to June 2019, to Gallo in October 2019. When they next met to discuss the issue, Gallo directed Walenciej to adopt a Little Sister through Big Brothers, Big Sisters; take an ethics training course; and discuss the situation with Dr. JerryJo Gilham, a mutual acquaintance who had previously consulted at the EOCC. But he still ultimately recommended that Walenciej replace him as Executive Director.

Walenciej; completed an internship, which Walenciej oversaw while in a romantic relationship with him, during paid working hours at the EOCC; and used an EOCC van for personal purposes, without verifying his driver's license or insurance information, when his personal car needed new tires.[5]  *Id.* at PID 270–73.  Allen told the Fishel Downey investigators that she felt she could not correct Grimard's behavior herself because of his relationship with Walenciej.

Finally, the Report found that Walenciej administered the Vivitrol program in ways that violated the EOCC's policies and Ohio law.  "The EOCC ha[d] no written policies and procedures regarding the administration of its Vivitrol Program," including no contract for Vostatek's services and neither documentation of malpractice insurance nor an indemnification clause.  *Id.* at PID 275–76.  Gallo had "minimal involvement, if any at all," with the program and deferred to Walenciej.  *Id.* at PID 275.  Vostatek was able to enter the EOCC and receive shipments, despite not being an employee.  Vostatek received assessment fees even when the patient opted not to receive Vivitrol shots.  The EOCC paid Vostatek from the Resident Commissary Account based on invoices it, not Vostatek, created.  And Vostatek provided and billed the EOCC for medical services other than Vivitrol injections.  Additionally, Walenciej, Gallo, Dane Watkins, and LaRoche—the four employees who worked on the Vivitrol program—all improperly accepted gifts from Vostatek:  a 50-inch television (Walenciej), Grey Goose vodka (Gallo, Walenciej, LaRoche, and Watkins), and incense burners (Walenciej, Watkins, and Gallo).[6]

---

[5] Walenciej testified that many other EOCC employees, including Gallo, also used EOCC vans for personal purposes.

[6] Walenciej admits she accepted the television, vodka, and incense burner, but testified that she thought accepting the gifts was allowed because (1) nobody ever told her she could not receive gifts from Vostatek, and (2) she received the television when Vostatek sold a building he owned and gave away furnishings that he otherwise would have thrown in the trash.

In short, the Report found that Walenciej "engaged in harassing and unprofessional behavior," "bullied subordinate employees," "did not follow [the] EOCC's hiring policies and procedures," had a relationship with Grimard and gave him preferential treatment, and improperly operated the Vivitrol program. *Id.* at PID 265–85. It therefore recommended terminating her employment. Because the investigation uncovered misconduct from other employees as well, the Report also recommended terminating Grimard's employment; disciplining, but not firing, Watkins; requiring LaRoche to complete additional training on ethics and other policies; and, given Gallo's planned retirement, "hasten[ing] [the EOCC's] hiring process and begin[ning] the transition to a new Executive Director as soon as practicable." *Id.* at PID 285–87.

The FGB promptly acted on the Report's recommendation and directed Gallo to terminate Walenciej's employment. The resulting termination letter, dated April 10, 2020, stated that the EOCC was firing Walenciej "following the results of an internal investigation that concluded [she] engaged in misconduct and inappropriate behavior in violation of numerous EOCC policies." R. 32-24, PID 1026. Gallo finished out his contractual term and now serves on the FGB.

On April 9, 2020, Walenciej's counsel wrote to Gallo requesting a public hearing before the FGB and JAB, pursuant to Ohio Revised Code § 121.22(G)(1). The EOCC's counsel responded, asserting that Walenciej was not entitled to a public hearing under § 121.22(G)(1) because she was an at-will employee not covered by Ohio Revised Code § 124.34, but that Walenciej had a right to appeal her termination to the Executive Director. The EOCC therefore construed Walenciej's letter as an appeal of the termination. Walenciej's counsel responded, saying that limiting Walenciej to a post hoc appeal hearing violated EOCC policy, contending that Gallo was "uniquely unsuited to preside over" any appeal, declining to participate in the "ad hoc

appeal process," and "reiterat[ing] [Walenciej's] request for a formal hearing" before the FGB and JAB. R. 24-12, PID 816–17.

### B. Procedural History

Based on the events described above, Walenciej filed an administrative charge with the Equal Employment Opportunity Commission (EEOC). She received a right-to-sue letter on May 24, 2022, and filed this timely[7] action on August 19, 2022. The now-operative Amended Complaint alleges that the EOCC engaged in sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Count 1), and Ohio Revised Code Chapter 4112 (Count 2), and seeks compensatory and punitive damages.

Following the close of discovery, the EOCC moved for summary judgment on both claims. As relevant on appeal, it first argued that Walenciej had not established a prima facie case of discrimination because Gallo, whom Walenciej identified as a similarly situated male employee, was not similarly situated. Second, it contended that Walenciej's claim would fail even if she had established a prima facie case because she "was terminated for a host of non-discriminatory reasons, including her admitted relationship with a subordinate employee, her failures in administering the Vivitrol program, her ethic[al] and policy violations with respect to receiving gifts, and her inappropriate language at work." R. 25, PID 863. And finally, it argued that Walenciej could not pursue punitive damages because (1) there were no violations to support such

---

[7] As a non-jurisdictional condition precedent to bringing a Title VII claim, a plaintiff must exhaust administrative remedies. 42 U.S.C. § 2000e-5(f); *Williams v. Nw. Airlines, Inc.*, 53 F. App'x 350, 351 (6th Cir. 2002) (order). To do so, a plaintiff files an administrative charge with the EEOC or another proper state or local agency. *Williams*, 53 F. App'x at 352. If the agency declines to pursue the claim and issues a right-to-sue letter, the plaintiff must sue within ninety days. *Id.* (citing 42 U.S.C. § 2000e-5(f)(1)). To demonstrate compliance with this scheme, a complaint should include exhaustion allegations and attach the right-to-sue letter. *See, e.g.*, *Dickerson v. Assocs. Home Equity*, 13 F. App'x 323, 324 (6th Cir. 2001). The Amended Complaint alleges that Walenciej filed an administrative charge with the EEOC and received the attached right-to-sue letter on May 24, 2022. And she sued on August 19, 2022—within 90 days of receiving her right-to-sue letter.

damages and (2) "political subdivisions like the EOCC are immune from punitive damages." *Id.* at PID 869.

The district court granted summary judgment in favor of the EOCC on both claims. It held that Walenciej had not established a prima facie case of discrimination because she and Gallo were not similarly situated and, even if she had established a prima facie case, the EOCC offered non-discriminatory reasons for firing her and no reasonable jury would have found that those reasons were pretextual.

Walenciej now appeals the district court's grant of summary judgment. As relevant on appeal, Walenciej contends that her termination was "without just cause and based upon pretextual grounds," R. 4, PID 29, the true ground being sex discrimination.

## II. Standard of Review

"The court reviews *de novo* the district court's grant of summary judgment, applying the same standards as the district court." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making that determination, "the court views the evidence in the light most favorable to the nonmoving party," and draws all reasonable inferences in the nonmoving party's favor. *Int'l Outdoor*, 974 F.3d at 697 (citation and internal quotation marks omitted). Although the movant bears the burden of establishing that there are no genuine disputes of material fact, she can meet that standard by showing that the non-moving party lacks evidence to support an essential element of her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

In sum, "[t]he key issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)). And "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). That said, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Moreover, "a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (citation and internal quotation marks omitted).

## III. Analysis

"Because the elements and legal standards for establishing unlawful sex discrimination are the same under Ohio Rev[ised] Code § 4112.02 and under 42 U.S.C. § 2000e–2," *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000), "we analyze the state and federal claims together," *McCarthy v. Ameritech Publ'g, Inc.*, 763 F.3d 469, 482 n.4 (6th Cir. 2014).

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Ohio law similarly makes it unlawful "[f]or any employer, because of the . . . sex . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to

discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A).

"Intentional discrimination claims under Title VII can be proven by direct or circumstantial evidence." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648–49 (6th Cir. 2012). "Direct evidence consists of facts that, if believed, require the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016) (cleaned up). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Ondricko*, 689 F.3d at 649.

When a plaintiff relies on circumstantial evidence, as Walenciej does here, she must satisfy the three-part burden-shifting framework first set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–03 (1973). Under that framework, the plaintiff must first "establish a prima facie claim of discrimination." *McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024). To do so, she must show that she: "(1) was a member of a protected class . . . ; (2) suffered an adverse employment action; (3) was qualified for the position held; and (4) was replaced by someone outside of the protected class[,] or [that] similarly situated non-protected employees were treated more favorably." *Id.* If the plaintiff makes these showings, "the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (citation and internal quotation marks omitted). Finally, "[i]f the employer identifies a legitimate reason, the burden shifts back to the plaintiff to prove that the employer's reason is pretextual." *Id.*

It is a close call whether Walenciej established a prima facie case for her sex-discrimination claim. We therefore assume without deciding that she met her burden on the first *McDonnell Douglas* step and proceed to steps two and three. And because Walenciej failed to create a genuine dispute of material fact as to pretext, we affirm the district court's grant of summary judgment in favor of the EOCC.

To meet its burden on step two of the *McDonnell Douglas* framework, the EOCC needed to identify a legitimate, nondiscriminatory reason for taking an adverse employment action against Walenciej. *See Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 778 (6th Cir. 2016). It met its burden by citing the misconduct identified in the Report, including Walenciej's mismanagement of the Vivitrol program, her harassing and bullying behavior, and her inappropriate relationship with Grimard**.** *See Adamov v. U.S. Bank Nat'l Ass'n*, 726 F.3d 851, 854–55 (6th Cir. 2013) (holding that a violation of company policy can be a legitimate reason for terminating an employee); *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 886–87 (6th Cir. 2020) (documented "questionable payments" and "abusive business practices" between a contractor and the state agency where the plaintiff directly supervised certain programs, along with the plaintiff's "toxic relationship with her subordinates," were legitimate, non-discriminatory reasons for the defendant to fire the plaintiff).

At that point, the burden shifted back to Walenciej to show pretext. *See Jackson*, 814 F.3d at 779. A plaintiff satisfies this burden at summary judgment by providing enough evidence for a reasonable factfinder to determine that the employer's proffered reason does not adequately explain its conduct. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021). Plaintiffs often prove pretext by showing that the defendant's proffered reason: "(1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the

adverse employment action." *Id*. (quotation marks omitted). But these common ways to show pretext "are not the only ways" a plaintiff can meet her burden. *Miles*, 946 F.3d at 888. Instead, "these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer [take the adverse employment action against] the employee for the stated reason or not?" *Id.* (internal quotation marks omitted).

Although her pretext argument on appeal is underdeveloped, Walenciej seems to argue that her misconduct was insufficient motivation for the employment action and did not actually motivate her termination. Appellant's Br. at 42–45; Reply Br. at 12–13. Neither argument persuades.

Walenciej first asserts that her misconduct did not warrant termination because Gallo engaged in similar conduct without being fired. Appellant's Br. at 42–45; Reply Br. at 12–13 When determining whether employees engaged in similar misconduct, we look to "the type, circumstances, and respective severity of the misconduct alleged." *Spratt v. FCA US LLC*, 812 F. App'x 348, 355 (6th Cir. 2020) (citing *Jackson*, 814 F.3d at 780–83, and *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331–32 (6th Cir. 2019)). Because Walenciej engaged in more serious misconduct than Gallo, the EOCC had valid reasons for treating Walenciej and Gallo differently. *See Johnson*, 942 F.3d at 331 ("The Department disciplined the [plaintiff and the other allegedly similarly situated employee] differently because their situations were *different*. Thus, [the plaintiff] has failed to present a case for discrimination.").

First, Walenciej ran the Vivitrol program, and its failures were directly attributable to her. *Cf. Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 502–03 (6th Cir. 2010) (finding conduct not comparable where the plaintiff had a higher "degree of culpability" than another employee). Gallo, on the other hand, "should have been more aware/involved" in the program but was not directly

responsible for its mismanagement. R. 24-5, PID 275, 287. Walenciej also accepted a television from Frank Vostatek (unlike Gallo) and engaged in a significant and unique amount of documented bullying and harassing behavior.

More importantly, Walenciej had an inappropriate romantic relationship with a direct subordinate that caused significant workplace disruptions, while Gallo did not. And substantial differences in conduct justify different disciplinary actions. *See, e.g.*, *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (finding that two employees were not similarly situated where one employee "allegedly sexually harassed at least one of his subordinates, including coercing one or more into having sexual relations with him," and the other allegedly allowed an unauthorized person into the workplace and violated a no-contact order by spreading rumors about another employee); *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569–70 (6th Cir. 2009) (finding that two nurses were not similarly situated, and that the plaintiff nurse had not shown pretext, when one nurse "supposedly failed to chart a patient assigned to her for an entire shift" and the other failed to chart four patients).

True, Walenciej points to her deposition testimony that Gallo also had a workplace romance, albeit one that did not make it into the Report. Appellant's Br. at 39–40 (citing R. 24-4, PID 166–68). Walenciej testified that (1) Gallo and his alleged romantic partner traveled together for work; (2) she once saw them "sitting intimately" in a restaurant and they moved apart when they saw her; and (3) she had heard "regular workplace gossip" that Gallo was having an affair. R. 24-4, PID 166–68. Accepting that Gallo was having an affair based on Walenciej's testimony, Walenciej cites no evidence that Gallo's alleged affair caused workplace disruptions like those her relationship with Grimard caused. *See Patches v. City of Phoenix*, 68 F. App'x 772, 773 (9th Cir. 2003) ("[The plaintiff] offered for comparison three male/female relationships and other

misconduct of male officers. These comparisons are not similar in all relevant aspects to [the plaintiff's] situation . . . [, in part because m]ost of the misconduct [the plaintiff] pointed to did not involve workplace disruption . . . ." (cleaned up)). Moreover, Walenciej testified that she never reported Gallo for having an affair, and that she thought nobody else had made such a report. *Cf. Malone v. Eaton Corp.*, 187 F.3d 960, 962 (8th Cir. 1999) ("[The plaintiff] admitted his affair to three other supervisory employees. One of these employees reported the incident, . . . [and] the other two employees confirmed [it] . . . . In the case of the female supervisor, [the employer] had only rumors and anonymous reports that she had violated company policy."). The record therefore provides no reason to think that the FGB knew about Gallo's affair and disregarded that knowledge to treat Walenciej more harshly. *See Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 716 (4th Cir. 2024) ("[I]ndependently fatal to her claim, . . . [the plaintiff] offers no evidence that either [of the people investigating the allegations] was involved in the decision not to investigate [the allegedly similarly situated employee] based on rumors of a romantic relationship with a subordinate, or indeed that [the investigating employees] even knew of such rumors.").

Walenciej's second pretext argument also fails. She contends that the main difference between her misconduct and Gallo's—her inappropriate relationship—was not the real reason for her termination. Appellant's Br. at 37–39. She specifically argues that (1) "the EOCC failed to present any evidence as to what grounds or conclusions that the EOCC's Facility Governing Board . . . in fact relied upon in terminating Ms. Walenciej," *id.* at 39 n.2, and (2) the EOCC still planned to promote her to Executive Director even after she disclosed the inappropriate relationship to Gallo. The first point is unpersuasive given meeting minutes reflecting that the FGB directed Gallo to act on the Report—i.e., that it terminated Walenciej's employment because of the misconduct documented in the Report, in which Walenciej's relationship with Grimard

loomed large. Whether the EOCC expressly stated that it discharged Walenciej primarily because of her relationship with Grimard or said that it discharged her because of misconduct in which her relationship with Grimard loomed large is, as the district court observed, "a distinction without a difference." R. 37, PID 1111. Walenciej's point about disclosing the relationship to Gallo likewise misses the mark because Gallo was not the decisionmaker ultimately responsible for firing Walenciej. Rather, the FGB decided to fire Walenciej based on the Report and directed Gallo to carry out its instruction. And the FGB, to which Walenciej does not claim to have disclosed her relationship with Grimard before Fishel Downey completed the Report, took prompt disciplinary action when it learned all the relevant information.

Next, Walenciej points to the EOCC's failure to follow its internal discipline policy and to provide her with a termination hearing. Appellant's Br. at 43–44. Even assuming the EOCC failed to follow its policy or provide a required hearing, failure to follow internal policies, without more, generally does not show pretext for discrimination. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) ("[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext.").

Walenciej also identifies inappropriate comments made by other EOCC employees at various times during her employment at the EOCC.[8] Appellant's Br. at 19. But isolated comments from non-decisionmakers that are not clearly connected to the termination decision are rarely enough to show pretext. *See White*, 429 F.3d at 246 (finding that, in the context of a failure-to-hire claim, allegations that a member of the hiring committee had previously sexually harassed

---

[8] Although the Amended Complaint alleges "a severe and/or pervasive hostile work environment based on sex," R. 4, PID 29, Walenciej abandoned any such claim below by not making any arguments about it in her response to the EOCC's summary judgment motion, which argued that "Plaintiff has not sufficiently alleged or included a hostile work environment claim [in the Amended Complaint], but to the extent this Court believes Plaintiff has, the record is devoid of any viable hostile work environment claim," R. 25, PID 864*; see also* R. 37, PID 1100 n.1. She does not address her hostile-environment claim on appeal.

female employees at the defendant employer "are entirely unrelated to the instant case and are qualitatively different from [the plaintiff's] claim of sex discrimination in hiring," and that "such evidence does not support [the plaintiff's] contention that [the employer's legitimate, nondiscriminatory] reason [for choosing another candidate] . . . was pretextual"); *Diebel v. L & H Res., LLC*, 492 F. App'x 523, 532–33 (6th Cir. 2012) (finding that, in an age discrimination case, questions about the plaintiff's retirement and "discriminatory comments about wanting to create a "'younger company'" did not show pretext where they were "isolated" and there was "little evidence" that the comments were connected to the adverse employment action); *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 498 (6th Cir. 2008) (finding a "few inappropriate comments . . . too thin a basis" to rebut the defendant's proffered reason for the adverse action).

Finally, Walenciej argues that because there was no express policy "prohibiting or regulating personal relationships among coworkers," the EOCC's termination of her employment based on her relationship with Grimard was discriminatory. Appellant's Br. at 41. But Walenciej was Grimard's superior, not his peer. And companies may have sound reasons for penalizing supervisors who date subordinates and not penalizing employees who date their peers. *Cf. Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1042 (7th Cir. 1993) ("[An employer] is entitled to enforce a no-dating policy (if one exists) against supervisors, who by virtue of their managerial positions are expected to know better, rather than subordinates."). Moreover, as the district court correctly noted, the EOCC had a policy in place prohibiting employees from acting in ways in which their personal interests "'would impair their objectivity,'" and "a romantic relationship between a subordinate and a superior is such a common example of impermissibly impaired objectivity that it is a cultural cliché." R. 37, PID 1111. Additionally, as discussed above, Walenciej and

Grimard's relationship caused many problems at the EOCC.  Walenciej's last argument therefore also does not defeat summary judgment.

## V.

For the reasons set out above, we AFFIRM.